218 F.2d 795
 Ann Macon FOSTER, A. Macon Foster, an infant by her mother and next friend Ann Macon Foster, et al., Appellants,
v.
Sara Perrine CARLIN, Aimee Eskridge Carlin, by her guardian ad litem T. Brooke Howard, et al., Appellees.
 No. 6887.
 United States Court of Appeals, Fourth Circuit.
 Argued November 16, 1954.
 Decided January 5, 1955.
 
 John J. Wicker, Jr., Richmond, Va. (Keith Carlin, Washington, D. C., pro se, and William M. Kabler, Alexandria, Va., on brief), for appellants.
 Glenn U. Richard and A. Carter Whitehead, Alexandria, Va., for appellee Sara Perrine Carlin.
 John Barton Phillips, Alexandria, Va., for appellee Charles C. Carlin, Jr.
 Before PARKER, Chief Judge, SOPER, Circuit Judge, and THOMSEN, District Judge.
 SOPER, Circuit Judge.
 
 
 1
 This suit was brought primarily to set aside as fraudulent an agreement of settlement executed on October 23, 1939 by the heirs of Charles C. Carlin, late of Alexandria, Virginia. The principal properties which Carlin owned in his lifetime were the stock, consisting of 2500 shares, of the Alexandria Gazette Corporation, which published a newspaper in Alexandria, Virginia, and a small apartment house located at No. 2008 16th Street, N. W. in Washington, D. C. Mr. Carlin died on October 14, 1938 leaving as his immediate family his wife, Lillian B. Carlin, and two sons, Keith Carlin and Charles C. Carlin, Jr. The effect of the agreement was to give the widow a monthly income and an apartment rent free for her life, and to divide the properties between the sons, allotting the apartment house to Keith and a controlling interest in the newspaper to Charles, Jr.
 
 
 2
 Certain transfers of the property had previously been made. At the time of Mr. Carlin's death the title to the apartment house was held by Keith and Charles, Jr. as tenants in common, and the necessary transfers were made to vest the entire title in Keith. The books of the newspaper corporation showed at Mr. Carlin's death that 1800 shares of the stock were held in trust for Sara Perrine Carlin, an infant daughter of Charles, Jr. and 700 shares were held by Charles, Jr. individually. Under the terms of the agreement 600 of the shares in trust were transferred to Charles, Jr., individually, so that he became the owner of the majority of the stock, and 1200 shares remained in trust for the benefit of his daughter. It is now charged that the entries on the corporate books in respect to the stock had been fraudulently made without consideration, and without the authority of Mr. Carlin, and that Keith had no knowledge of the fraud when he agreed to the settlement. On this account Keith seeks to set aside the agreement of settlement and to secure an adjudication that one-half of the stock belongs to Charles, Jr. and one-half to him or his family; and also an accounting of the income of the corporation from his father's death. He makes no offer to return the apartment house, which he sold for $155,000 in 1949; and he contends that in any event he should not account for more than $13,000 which he estimates to be the value of one-half the equity in the building at the time of his father's death. Jurisdiction of the District Court over the controversy was sustained by this court in Foster v. Carlin, 4 Cir., 200 F.2d 943.
 
 
 3
 The plaintiffs in the pending suit are Keith, his former wife, his children and one grandchild. The latter are joined because of a claim on their part that on April 1, 1940 he assigned to them his interest in the estate of his father whereby they became vested with any interest which he may have had in the stock. The defendants are Charles, Jr., his former wife, his children, including Sara Perrine Carlin, the substituted trustees holding stock of the corporation for her benefit, and by intervention, Mardel Securities, Inc. which has purchased her 1200 shares of stock.
 
 
 4
 The leading characters in the case are Charles C. Carlin, Sr., Lillian B. Carlin, his wife, Keith and Charles C. Carlin, Jr., his sons, and Sara Perrine the daughter of Charles C. Carlin, Jr. For convenience they will be referred to as Mr. Carlin, Mrs. Carlin, Keith, Charles and Sara Perrine.
 
 
 5
 The evidence pertaining to the matters in controversy ranges over a period of twenty years prior to the institution of the pending suit, and the details of the litigation are numerous and complicated. For the purposes of this suit the following outline will suffice: The transactions cover three periods: (1) those which occurred before the death of Mr. Carlin; (2) those which occurred between his death on October 14, 1938 and the agreement of settlement on October 23, 1939; and (3) those which occurred between that date and June 14, 1951 when the pending suit was instituted.
 
 
 6
 Mr. Carlin was a well known practicing attorney of Alexandria, Virginia. He served for a period of years as a member of Congress. Both of his sons were also lawyers. For some time prior to Mr. Carlin's death Keith was a practicing lawyer in California, but in 1937 he returned to the Washington area. Charles devoted the greater part of his time to the affairs of the newspaper and was a dominant figure in its management for a number of years prior to 1938 while his father was in failing health.
 
 
 7
 During the financial depression of the early 1930s, Mr. Carlin was financially embarrassed. The District Judge found on conflicting testimony that in 1932, in a conversation with Charles and the latter's wife, Mr. Carlin expressed the desire to protect his stock in the Gazette Corporation from creditors by putting the stock in trust in the name of Sara Perrine who at the time was the infant daughter of Charles and the youngest member of the family. The minutes of the newspaper corporation show that a meeting of stockholders was held on January 10, 1933 at which Mr. Carlin directed that a stock certificate for 1800 shares out of a total of 2500 shares outstanding be issued in the name of John Tulloch, an employee of the newspaper corporation, as trustee for Sara Perrine until she should come of age; and the minutes also show that on June 5, 1934 at a stockholders' meeting Mr. Carlin directed that in consideration of love and affection a stock certificate for 700 shares of the stock be delivered to his son Charles.
 
 
 8
 In 1931, prior to the transactions with respect to the stock of the newspaper corporation, Mr. Carlin bought an apartment house at No. 2008 16th Street, N. W. in Washington, and took title to the property in the name of himself and Charles, as tenants in common.
 
 
 9
 The relations between the brothers were strained and in 1937 they became particularly tense and bitter. Keith was apprehensive that his brother Charles was taking advantage of his father, who was in feeble condition, so that Keith's interests were suffering thereby. Accordingly, on May 24 and again on June 1, 1937 Keith wrote to his father complaining at length that Charles had received greater financial assistance from his father than he had, emphasizing particularly the gift to Charles of one-half of the apartment house and the value to Charles of his connection with the newspaper. In response Mr. Carlin wrote a letter to Keith saying that he was the sole owner of the Alexandria Gazette and that the stock of the corporation was held in trust for him by John W. Tulloch. This letter was witnessed by the son-in-law of Keith on June 12, 1937 and Keith carefully preserved it. Mr. Carlin rapidly failed physically during the summer of 1937 but except for lapses of memory his mental condition was good. Keith dined with his father nearly every night. He testified that he questioned his father about his stock in the newspaper corporation and about his apartment house and other properties, and that his father said that he had put all of the stock in trust with Tulloch to hold for him until he issued instructions as to its disposition. On August 31, 1937 Mr. Carlin wrote to Tulloch notifying him of the termination of the trust of the stock and demanding the return of the certificates.
 
 
 10
 On the same day Mr. Carlin made a will in which he left his real estate to his wife for life with remainder, except as to the apartment house, to his two sons as tenants in common. He devised his one-half interest in the apartment house to Keith. He bequeathed his stock in the Alexandria Gazette Corporation, which he described in his will as owned or held in trust for him by Tulloch, to his sons as executors and trustees, to pay the net income to his wife for life and upon her death to divide the stock in such a way that Charles should receive a number of shares which, if added to those he then owned would give him 50 per cent. of the total, and he bequeathed the remaining 50 per cent. to Keith. Two weeks later, however, on September 15, 1937 Mr. Carlin revoked the will stating that he had made it in the belief, which proved to be incorrect, that his son Charles was about to die.
 
 
 11
 The next month, on October 19, 1937 Mr. Carlin conveyed his one-half interest in the apartment house to Keith but Mrs. Carlin did not join in the conveyance. Keith testified in respect to this transaction that there were two law suits pending against his father in the District of Columbia, and that the lawyers advised his father to divest himself of his real estate in the District of Columbia; and since he intended to give Keith the one-half interest in any event, this was a good time to do it, especially as it did not require as much capacity in Keith's opinion to execute a deed as to execute a will.
 
 
 12
 On October 10, 1938, Keith, having noticed a statement of ownership published in the Alexandria Gazette to the effect that the stock of the corporation was owned by Charles Carlin personally, and by Tulloch, as trustee, wrote to the Post Office Department that he was in possession of evidence that whatever trust had been held by Tulloch had been revoked more than a year ago, and that Charles had knowledge of the fact. In reply the Post Office Department sent to Keith a copy of the statement made by Charles showing that the stockholders of the Alexandria Gazette Corporation were C. C. Carlin, Jr., John W. Tulloch, Trustee, and Sara Perrine Carlin.
 
 
 13
 Thus matters stood on October 14, 1938, when Mr. Carlin died. Thereafter certain probate proceedings in his estate were filed in the Corporation Court of the City of Alexandria and certain negotiations took place between the interested parties which led to the agreement of settlement which is now attacked as fraudulent. Mrs. Carlin filed for probate a will of her husband executed on August 16, 1892 wherein he left all of his property to her. Keith and Charles were summoned in these proceedings and Charles assented to the probate of the will. Keith objected to the jurisdiction of the court on the ground that his father was a resident of Washington and objected to the validity of the service of the summons upon him. He also produced a copy of his father's will of August 31, 1937, which had been filed with the Register of Wills in Washington. Charles on his part produced the revocation of that will on September 15, 1937; and the case was set for argument on December 19, 1938.
 
 
 14
 Meanwhile, on December 5, 1938 Keith wrote Charles suggesting that the dispute over the wills be submitted to arbitrators which he named, but Charles rejected the proposal and informed Keith that other persons, including a minor, had an interest in the Gazette. Keith wrote an angry letter in reply in which he accused his brother of false conduct, hypocrisy, and fraudulent schemes over a period of three or four years.
 
 
 15
 Both brothers were represented by able counsel and Keith himself, being of an aggressive temperament, took an active part in the negotiations. On December 16, 1938 he sent to Charles a rough draft of a proposed settlement, the heart of which, as he stated to his lawyer, was that he got the apartment house, Charles got the Alexandria Gazette and the mother got all of the income from both properties as well as the net income from her husband's estate for life, together with a rent free apartment. The negotiations proceeded over a course of months and were delayed to some extent by sickness of counsel.
 
 
 16
 Keith testified that in April, 1939 Charles told him of a trust of an undisclosed number of shares of stock made by Mr. Carlin in favor of Sara Perrine, and that Charles owned the remainder of the stock. As we have seen, Keith had already heard of this trust. It was pointed out to him that on account of the trust a suit in chancery must be instituted so that Charles might get the stock of the Gazette, as proposed in the settlement agreement. Keith stated, however, that neither he nor his mother would become a party to such a suit as it would require admissions contrary to the facts. He explained during the trial in the instant suit that he did not then believe there was any trust — it was all false — "a phony trust."
 
 
 17
 The chancery suit was brought in September, 1939, in which the plaintiff was Sara Bayol Carlin, guardian of her daughter, Sara Perrine, and the defendants were Sara Perrine, Charles and his wife, and also a Committee for Charles which had been appointed in the meantime because he had suffered a nervous breakdown. The other defendants were a sister of Sara Perrine and John W. Tulloch, trustee for Sara Perrine. The purpose of the suit was to secure approval by the court of the settlement agreement whereby the transfer to Charles of 600 shares out of the 1800 held in trust for Sara Perrine was to be made, so that together with 700 shares owned by him individually, he would have a controlling interest in the corporation. The justification for the transfer was the confirmation of the title of Sara Perrine to the remaining 1200 shares held for her benefit, the transfer by Charles of his interest in the apartment house to Keith, and the assumption by Charles of responsibility for carrying out the agreement.
 
 
 18
 Keith testified that during this period he was told by Charles' attorney that there was a paper writing evidencing the existence of the trust, and that although he was given no details, he accepted this statement and believed that the trust existed. However, he admitted that at no time did he disclose that he was in possession of the letter of June 12, 1937, signed by his father, to the effect that his father was the sole owner of the stock of the corporation which was held for his benefit in the name of John W. Tulloch, Trustee.
 
 
 19
 The agreement of settlement was signed on October 23, 1939 and actually consummated early in 1940. The crucial contention that the agreement was vitiated by fraud and should be set aside, rests largely on certain statements made by Charles in 1942 and later years after he had become involved in a dispute with John W. Tulloch who held the 1200 shares of stock of the Alexandria Gazette in trust for the benefit of Sara Perrine. Tulloch had been in the employ of the newspaper for many years, had been its managing editor at one time and during the incompetency of Charles had served as general manager of the business. Charles recovered in April, 1940 and appointed another manager and Tulloch severed his connection with the business. On May 15, 1942 Tulloch, acting as trustee for Sara Perrine, brought suit in the Corporation Court of the City of Alexandria for the appointment of a receiver of the corporation charging the management with various wasteful and injurious acts. The court declined to appoint the receiver but in its final decree gave directions as to the management of the business which showed that Tulloch's charges were not without foundation and that the control of the corporation by Charles should be regulated and restrained.
 
 
 20
 In the course of this proceeding Charles made a deposition in which he testified that his father gave him all the stock of the corporation eight or ten years before his death; that Mr. Carlin was not present at the meeting of stockholders when the trust for the benefit of Sara Perrine was created according to the minutes; that Charles conceived the idea of creating what purported on its face to be a trust so that he might have an instrumentality to compel a settlement with Keith and his mother if the occasion should arise; and that Charles himself had never recognized the trust as valid but had conducted the business as if it belonged to him individually and that he intended to take action to set the trust aside.
 
 
 21
 Keith testified that from April, 1942, until the year 1945 he was in the army; and from 1945 to 1951 he lived in California and during this period was in Virginia only a part of the time; and that he was not informed of Charles' deposition in the receivership suit and had no knowledge that the trust was fraudulent and invalid until May, 1951, the month before he filed the pending suit, when he visited Charles in Alexandria and Charles told him that he had concocted the whole scheme and that both the transfer to Tulloch, Trustee for the benefit of Sara Perrine, and the transfer to himself were made without his father's authority. Keith himself, however, testified, as we have seen, that in December, 1938, after his father's death, he accused his brother of devising fraudulent schemes for three or four years and that in April, 1939 he told Charles that he believed that the trust was phony and had no existence. Furthermore, Charles' second wife testified that in 1947 Keith was informed of the purport of his brother's deposition in the receivership case. Upon all of the testimony the judge found that as early as 1947 Keith knew that Charles had asserted that the trust for the benefit of his daughter was only a pretense and had no actual existence. This finding was fully justified by the evidence.
 
 
 22
 That Charles made the statements in 1951 in regard to the creation of the trust which are attributed to him by Keith, was confirmed by several other witnesses. Strong light, however, is thrown upon Charles' change of attitude by the litigation over the trustee's stock which began with the receivership suit and was continued thereafter in other cases between Charles and Tulloch, Trustee, and between Charles and his daughter in her own right after she became of age in August, 1949. There were three additional suits which need not be described in detail — (1) A suit by Tulloch, Trustee, against Charles and Sara Perrine in August, 1949, to determine who was the owner of the 1200 shares of stock and to define the powers and duties of the trustee. This suit did not come to trial but was dismissed without prejudice. (2) A suit by Sara Perrine against Tulloch, Trustee, and the Alexandria Gazette Corporation on December 5, 1949 in which Sara Perrine, having become of age, sought delivery of the stock to her or in the alternative the payment of $100,000 with damages for unlawful detention. In this suit the court passed a decree on June 18, 1951, in accordance with a stipulation of counsel, that there were 2500 shares of the stock of the corporation outstanding of which 1300 were owned by Charles and 1200 were held by the corporation as collateral security for a loan. The court refused an offer of Charles to pay $115,000 for the stock and appointed substituted trustees for Tulloch, who had died, and ordered the corporation to deliver the stock to Sara Perrine upon the payment of the loan. The Supreme Court of Appeals of Virginia rejected the petition of the Gazette Corporation for appeal from this judgment. (3) In the meantime, on December 28, 1949, Charles had brought suit against Sara Perrine to enjoin her from prosecuting the last mentioned action and prayed specific performance of an agreement between him and Sara Perrine for the sale to him of the stock for the sum of $50,000. The court dismissed the complaint and the Supreme Court of Virginia rejected Charles' petition for permission to appeal.
 
 
 23
 Charles did not testify in the pending suit. It is significant that he made no attack upon the trust after his father's death until the trustee of his daughter's stock brought the suit in 1942 on her behalf which interfered with his management. The stock seems to have been of little value at the time of the settlement. The net profit of the business for the year ending December 31, 1940 was only $883.25. The balance sheet for December 31, 1940, prepared by accountants for the corporation, showed a net worth of $85,081.80; but of this sum $42,786.44 was the book value of fixed assets consisting largely of machinery and equipment, and good will was put in at the sum of $33,620.42. In view of the nature of the property and the nominal income shown by the statement, it is apparent that the market value of the assets was small and that the success of the business depended upon the efficiency of the management. The newspaper, however, was a going concern and furnished an occupation with substantial salaries to Charles and other officers of the company, and hence it was desirable for him to secure the control of the corporation in the final settlement. It was not until nine or ten years later that, with the growth of the local population, the corporation became so prosperous that his daughter was able to sell her 1200 shares of stock for $115,000.
 
 
 24
 These figures explain why Keith, who was in close touch with his father during the month preceding his father's death and must have known the uncertain condition of the newspaper, preferred the apartment house. In 1940 the apartment house was appraised at $70,000 and was subject to a deed of trust of $44,000, so that the equity seems to have been worth $26,000; but the rents produced a return on the investment and there is nothing to show that in the conditions then prevailing Keith did not receive property equal in value to that received by Charles. In the end Keith profited by his bargain for in 1949 he sold the apartment house for $155,000. It cannot be said that either party suffered from the distribution of 1940.
 
 
 25
 The District Judge dismissed the suit after an exhaustive examination of the evidence which is set out in some detail in his opinion. He held (1) that the settlement was not induced by fraud; (2) that Keith's claim was barred by laches and (3) that the trust for the benefit of Sara Perrine was valid. Without in any way questioning the findings on the second and third points, we find it sufficient to affirm the judgment on the ground that the agreement of settlement was valid and was not induced by fraud. Thereby the rights of Charles and Sara Perrine to the stock of the corporation and the right of Keith to the apartment house were fixed, and they have been confirmed by the decisions of the Virginia courts insofar as they had occasion to consider them.
 
 
 26
 We find nothing in the record which would justify the holding that the judge was clearly wrong in the finding of facts which support the conclusion that the agreement was not induced by fraud. To the contrary the findings were amply justified. The evidence refutes the contention of Keith that he was induced to sign the agreement in the mistaken belief that the trust was valid. During the negotiations with his brother over the settlement of his father's estate Keith denounced Charles for long continued fraudulent transactions and, when informed by Charles that some of the stock was held in trust, he told Charles that the trust was phony and did not exist. At that time he was in possession of letters in which his father asserted that all of the stock was his and that the stock in trust was held for his benefit. Keith himself made the proposal for the division of the property between himself and his brother at a time when he did not believe that the trust existed, and thereby he not only cleared up the title to his one-half interest in the apartment house, but also obtained entire ownership of the property, which he obviously preferred to the newspaper; and he left the newspaper to his brother who was familiar with the business and doubtless preferred it. Additional positive proof that Keith was satisfied with the settlement is found in the circumstance that he made no effort to set aside the agreement in 1947 when he learned that Charles, to serve his own purposes, had repudiated the trust. The present suit was not brought until 1951 after he had discovered that the stock of the newspaper had greatly increased in value. He cannot now be heard to say that the trust had any bearing on his decision to sign the settlement agreement.[1]
 
 
 27
 The rule of law applicable to these circumstances is well established. As was said in Alexander v. Kuykendall, 192 Va. 8, 14, 63 S.E.2d 746, 749: "`One of the fundamental principles in regard to fraudulent representations is that the false statement must be believed and relied on by the party to whom it is addressed, otherwise, however false or fraudulent the intent, the false statement does not constitute any ground for the rescission of a contract or action for damages.'" See also American Surety Co. v. Hannah, 143 Va. 291, 300, 130 S. E. 411; Baker v. Baker, 54 App.D.C. 214, 296 F. 961; General Finance Corp. v. Keystone Credit Corp., 4 Cir., 50 F.2d 872, 881. Restatement of Contracts, § 476. The courts of Virginia have taken the position that family settlements should not be set aside except upon the most clear and convincing proof because such agreements enjoy a favored position under the law. Weade v. Weade, 153 Va. 540, 150 S.E. 238; Hicks v. Wynn, 137 Va. 186, 119 S.E. 133. The decision of the District Court in the pending case is in accordance with the facts and with this policy, and will be
 
 
 28
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 At no time prior to the suit did Keith offer to return the property which he received in the settlement or in any other manner to comply with the cardinal rule which requires the party seeking rescission of a contract to restore the parties to the condition existing at the time of its execution as far as it can be done. During the trial his attorneys took the position that Keith was under no obligation to return anything which he received but, however, offered, if the court should require it to return the sum of $13,000, the approximate value of Keith's one-half interest in the apartment house at the time of his father's death. No offer was made to account for one half of the sum of $155,000 for which the property was sold. These circumstances may be taken into consideration as evidence of Keith's attitude in respect to the matters now in controversy; but, in view of the conclusion which has been reached, further discussion of the point is unnecessary