MARDEL SECURITIES, INC., a Delaware Corporation, Plaintiff,

v.

ALEXANDRIA GAZETTE CORPORATION, a Virginia corporation, and Charles C. Carlin, Jr., Defendants.

Civ. A. No. 1519.

United States District Court
E. D. Virginia,
Alexandria Division.
April 22, 1960.

Oren R. Lewis, Arlington, Va., A. Carter Whitehead, Alexandria, Va., James H. Simmonds, Arlington, Va., for plaintiff.

John Barton Phillips, Alexandria, Va., for defendants.

WALTER E. HOFFMAN, District Judge.

Mardel Securities, Inc. (hereinafter referred to as "Mardel"), has instituted this secondary action in its capacity as a 48% minority stockholder of the Alexandria Gazette Corporation (hereinafter called "Gazette"), publishers of a newspaper advertised as "America's Oldest Daily Newspaper", against the Gazette and its principal officer, Charles C. Carlin, Jr., the latter being the owner of 52% of the outstanding stock issued by the Gazette. Plaintiff contends that Carlin is indebted to the Gazette in substantial amounts allegedly occasioned by reason of Carlin's ownership and operation of a newspaper known as the "Arlington Daily Sun", hereinafter referred to as the "Sun", which said newspaper [1] Carlin caused to be printed at, and partially operated from, the physical plant of the Gazette at Alexandria, Virginia, only a few miles from Arlington where the Sun had its principal office but possessed no facilities for printing the newspaper. Plaintiff contends that the amounts charged to the Sun by the Gazette resulted in substantial losses to the Gazette for which Carlin, by reason of his fiduciary capacity, is liable to the Gazette. In short, the action, while maintained by the minority stockholder, is actually for the use and benefit of the Gazette corporation pursuant to Rule 23

---

1. Where the word "Sun" is used in this opinion, it is intended to include Carlin's sole ownership of the Arlington Daily or Arlington Daily Sun, unless otherwise designated.

(b) of the Federal Rules of Civil Procedure [2], 28 U.S.C.A.

The stock ownership of the Gazette has been the source of continuous litigation in state and federal courts for many years. In Foster v. Carlin, 4 Cir., 218 F.2d 795, Judge Soper reviews at length the various phases of the protracted litigation. An earlier opinion by Judge Dobie in Foster v. Carlin, 4 Cir., 200 F.2d 943, touches briefly on the past history of the Gazette's ownership and operation. It would serve no useful purpose to review these opinions as they are matters of record. It is sufficient to state that Mardel acquired its 48% stock interest for the sum of $115,000 by purchase from Sara Perine Carlin, the daughter of Charles C. Carlin, Jr., in November, 1952. While the motives of Mardel in acquiring this stock are not free from doubt, the present action does not seek to hold Carlin responsible for his activities with respect to the operation of the Gazette for any time prior to the date Mardel purchased the stock, other than as to the admitted amount due by Carlin to the Gazette as of December 31, 1952, which was $80,218.99.

One phase of the prior litigation has some evidentiary value in a determination of the issues now before the Court. On May 15, 1942, one John W. Tulloch, acting as trustee for Sara Perine Carlin, then an infant, instituted an action in the Corporation Court of the City of Alexandria seeking the appointment of a receiver for the Gazette, and charging Charles C. Carlin, Jr., with various wasteful and injurious acts in the management of the corporation. As noted by Judge Soper in the second Carlin case, supra, 218 F.2d 799, the state court declined to appoint the receiver but "in its final decree gave directions as to the management of the business which showed that Tulloch's charges were not without foundation and that the control of the corporation by Charles [Carlin, Jr.] should be regulated and restrained". Specifically, these charges of mismanagement and waste concerned the operation and printing of the Arlington Daily (later the Arlington Daily Sun), a newspaper solely owned by Carlin in his individual capacity and started by him in 1942 [3]. A portion of the state court decree reads as follows:

"That Charles C. Carlin, Jr., personally and individually, shall pay in advance for the cost of producing and distributing a certain newspaper publication now known as the Arlington Daily which is published by the Alexandria Gazette Corporation. The daily cost to be so paid shall bear the same proportion to the daily circulation of the Arlington Daily as 82.74 bears to 8,000. This provision shall operate as of June 23, 1942.

"As of June 23, 1942, of the revenue derived from contracts then existing for what is known as local advertising and classified advertising entered into at a higher rate because of increased circulation thru the Arlington Daily, the Alexandria

---

2. Rule 23(b) of the Federal Rules of Civil Procedure provides:
 "Secondary Action by Shareholders. In an action brought to enforce a secondary right on the part of one or more shareholders in an association, incorporated, or unincorporated, because the association refuses to enforce rights which may properly be asserted by it, the complaint shall be verified by oath and shall aver (1) that the plaintiff was a shareholder at the time of the transaction of which he complains or that his share thereafter devolved on him by operation of law and (2) that the action is not a collusive one to confer on a court of the United States jurisdiction of any action of which it would not otherwise have jurisdiction. The complaint shall also set forth with particularity the efforts of the plaintiff to secure from the managing directors or trustees and, if necessary, from the shareholders such action as he desires, and the reasons for his failure to obtain such action or the reasons for not making such effort."

3. About 1951, Carlin purchased from one Blummer a weekly paper called the Arlington Sun, and then merged the two publications into a daily. The purchase price was $25,000.

Gazette Corporation shall receive so much thereof as it would have received at the 1941 average rate, and of all over that amount 7½ cents per inch shall go to Charles C. Carlin, Jr., and 7½ cents per inch shall go to the Alexandria Gazette Corporation.

"From this date, when local, legal, and classified advertising is published in the Gazette and the advertiser also wishes it published in the Arlington Daily, the Alexandria Gazette Corporation shall receive such amount of the revenue therefrom as it would receive at the rate for Gazette publication alone, and all over that shall go to Charles C. Carlin, Jr.; and when local, legal, and classified advertising is published in the Arlington Daily and the advertiser also wishes it published in the Gazette, the Alexandria Gazette Corporation shall receive the amount of the revenue it would receive at the rate for Gazette publication alone, and all over that shall go to Charles C. Carlin, Jr.

"As of June 23, 1942, all revenue from local, legal, and classified advertising published exclusively in the Gazette shall go to the Alexandria Gazette Corporation; and all the revenue from local, legal and classified advertising published exclusively in the Arlington Daily shall go to Charles C. Carlin, Jr.

"As of June 23, 1942, all revenue derived from paid circulation of the Gazette shall go to the Alexandria Gazette Corporation, and all revenue derived from paid circulation of the Arlington Daily shall go to Charles C. Carlin, Jr.

"That the books of the Alexandria Gazette Corporation shall be kept so that the foregoing allocations of the cost of production and of the revenue can be conveniently made."

In 1945 an order was entered dismissing the action instituted by Tulloch, Trustee. While Carlin testified that, from 1942 to 1945, the decree of the state court had been met, it is abundantly clear that such was not the case. However, the state court decree and formula prescribed therein is of no particular significance, except that Carlin knew, as long ago as 1942, that rights of minority stockholders had to be protected by reason of his commingled operation of two newspapers. It is peculiarly strange that, although Carlin stated that the operation and printing of his solely owned newspaper was discussed at length with the directors of the Gazette, the corporate minutes for the years 1942–1952, both inclusive, make no mention of the printing or publishing of the Arlington Daily, the Arlington Sun, or the Arlington Daily Sun. During this period of time Carlin controlled the Gazette and, in at least one instance, he forced the resignation of directors who had declined to vote in accordance with his wishes [4].

The Sun (or its predecessor) was continuously printed, and in part published, by the Gazette under a verbal arrangement between Carlin and the Gazette from April, 1942, until Carlin sold the Sun effective March 31, 1957, on terms hereinafter discussed. The Gazette's sole interest in the Sun was from the standpoint of protection from competition. Undeniably there have been many discussions as to the possible merger of the two publications, including, as well, consideration of the value of the Sun, but such prospects were continuously beclouded by Carlin's indebtedness to the Gazette occasioned by prior combined op-

4. At a meeting of the Board of Directors held on May 4, 1942, Carlin announced that the purpose of the meeting was to dismiss Sara B. Carlin (his former wife) as Secretary-Treasurer and stated that any directors not willing to aprove this action would be dismissed from the Board and from their positions with the Gazette. Carlin's proposal was rejected by a 4 to 3 vote, and thereafter three directors resigned and the remaining directors thereupon approved Carlin's plan. Sara B. Carlin, who had not resigned, was later dismissed and removed from office.

erations at a loss to the Gazette. Prior to 1952 the charges made to Carlin by the Gazette for printing the Sun were confined to the manufacturer's cost of newsprint, type metal, ink, and dry mats (excluding storage and drayage charges), and all news features and other services were furnished gratis.

The initial written record in the Gazette's corporate minutes relating to the operation of the Sun appears in the minutes of April 1, 1953, at which time Carlin was absent due to illness. At this meeting we find the following:

"The business of the Corporation was discussed. Consideration was given to the terms upon which the Gazette would continue to print the Daily Sun. After some discussion it was moved, duly seconded and carried that Messrs. Phillips and Stearman be authorized to work out and to put into effect terms that would in their opinion be proper and equitable to both the Gazette and Mr. Carlin. In view of the relationship between the Gazette and the Daily Sun, it was agreed that no interest would be charged on the account of Mr. Carlin, incurred by reason of his publication of the Daily Sun."

This meeting, it will be noted, was held approximately four months following Mardel's acquisition of the 48% minority interest, and at a time when the minority stockholder had no representation on the Board of Directors.

The formula devised by Messrs. Phillips and Stearman was supposedly put into effect in three stages; the first for April, 1953; the next for May, 1953; and the third for September, 1953. In April the charges for materials provided to the Sun were fixed at manufacturer's costs and included, in addition to items previously charged to the Sun, charges for one-half the cost of newspaper delivery and one-half the rental of an en-

graving machine plus cost of materials used. Additionally, charges were made to the Sun for group hospitalization based on actual cost, and foreign commissions to Shannon & Associates based on actual cost. In May, 1953, additional charges to the Sun were made for the first time covering a proportion of the total cost of service provided by the editorial department, the United Press Association, the International News, and King Features Syndicate. Likewise, a part of the salary of two employees was placed against the Sun, and all overtime in the composing and stereotype departments was allocated to the Sun. Thereafter, in September, 1953, by reason of the change from a 48 hour week to 40 hour week, all additional personnel in the composing and stereotype departments were charged to the Sun, with the following notation apparently applicable to the advertising department:

"Inasmuch as the Sun is being used to protect our advertising circulation areas, no additional charge will be made to the Sun at this time."

The Phillips-Stearman [5] formula was not presented in writing to the Gazette's certified public accountants, Stanton, Minter and Bruner. Only an unaudited statement was requested by the Gazette's management for the year 1952, which was the first year that Stanton's firm served in this capacity. The evidence does disclose that the accounting firm conferred with Stearman as to charges made to the Sun, and in 1952 the accountants recommended that a portion of the payroll, cost of editorial staff, etc., be assessed against the Sun, but this recommendation was not followed by the Gazette's management. Even subsequent to 1952, and until the sale of the Sun in March, 1957, the management did not make the charges to the Sun as recommended by the accountants. No charges were ever made for editorial or news coverage salaries, even though

5. John Barton Phillips has served as Executive Vice President of the Gazette since March 1, 1953. Lewis A. Stearman has been associated with the Gazette since 1940, initially as bookkeeper, then as auditor, and, since 1953, as Comptroller and General Manager.

the accountant had suggested that the management charge, as payroll expense, the proportionate part of the time occupied by the Gazette's employees that were devoted to printing and publishing the Sun. In short, the charges made to the Sun by the Gazette's accountants were such as were fixed by the Gazette's management.

Throughout the years national advertising has been solicited and secured on a joint basis for the two publications. Even today, by reason of the sales agreement executed by Carlin in disposing of the Sun, there is a joint arrangement between the Gazette and the new owner of the Sun. Rates were, from time to time, revised and these changes were presumably established by reason of the circulation of each paper. All national advertising material was sent to the Gazette. Prior to September, 1951, the 12¢ per line rate was divided between the two publications on the basis of 8¢ to the Gazette and 4¢ to the Sun, and all such national advertising was on a combination basis for both papers, excepting automotive rates which, as of July 1, 1950, carried a combination rate of 12¢ per line, and an optional single rate of 10¢ per line for the Gazette and 5¢ per line for the Sun (Daily). Effective September 1, 1951, the flat line rate for combination advertising was increased to 16¢, at which time the national advertising revenue was divided equally between the Gazette and the Sun. Automotive rates were increased to 18¢ per line on a combination basis, with an option to publish in the Gazette only at 10¢ per line. Effective April 15, 1956, the combination flat line rate was raised to 20¢, with an optional automotive rate for the Gazette only at 12¢ per line. The equal division between the Gazette and Sun remained as before stated.

Stearman, the comptroller, with 18 years experience in the newspaper field, concedes that the Gazette was the predominant cause of the sale of national advertising. Of course, there were certain advantages to both papers in the combination advertising arrangement—

The Gazette could point to increased circulation through the joint procedure—the Sun, with a considerably shorter history, had the benefit of the well-established Gazette for national coverage. Admittedly, however, the Sun was favored by the joint arrangement, not only in securing national advertisements and the division of revenue, but also in the Gazette's assumption of overhead expense.

Manifestly, Carlin has operated the Sun with only slight regard for the financial welfare of the Gazette. It is said that none of the revenue derived from the Sun was appropriated for Carlin's benefit. Assuming arguendo that this statement is correct, nevertheless the assistance afforded by the Gazette prevented severe financial reversals on Carlin's part. When the Sun was finally sold in March, 1957, the proceeds of said sale amounting to $112,500 inured to the benefit of Carlin and not to the Gazette. True, the purchase agreement provides that all payments received by Carlin shall be first applied to the satisfaction of Carlin's debts to the Gazette, but such a proviso undertakes to do nothing more than Carlin is admittedly obligated to do, i. e., to pay the Gazette what Carlin concedes is due and owing. It follows that the sale of the Sun was exclusively for the benefit of Carlin, although the value of the Sun had been increased over a period of years by reason of the Gazette's assumption of a substantial part of the cost of printing, publishing, and operating. Moreover, the sale of the Sun imposed additional obligations upon the Gazette in that (1) a newsprint tonnage contract executed by the Gazette and Carlin was made operative to the purchaser's benefit for a period of 5 years, subject to the purchaser's ability to receive a mill contract to purchaser's satisfaction; (2) Carlin agreed, as majority stockholder of the Gazette, to enter into joint ventures with the purchaser for the future sale of national advertising and display advertising, wherever combined advertising was requested, with the revenue being divid-

ed according to paid circulation of each newspaper, the agreement being for an indefinite term; (3) as to then existing combination advertisements, Carlin agreed that the share of revenues would remain in accordance with the understanding between the Gazette and Sun in March, 1957; (4) Carlin agreed, individually and through the Gazette, not to lease, operate, edit, print or conduct any newspaper or advertising paper in Arlington County and that portion of Fairfax County served by the Sun and Northern Virginia Advertiser, for a period of ten years from April 1, 1957; (5) both Carlin and the purchaser agreed to certain non-competing areas as to circulation, distribution, and advertising campaigns, for a period of three years from April 1, 1957; (6) in the event of fire, disaster, or labor difficulties, the parties respectively agreed to permit each other to print the paper of the affected party on the basis of cost, plus an overhead figure to be agreed upon, but without charge for profits, for a period of three months.

The sales agreement involving the Sun was subsequently approved by the Gazette's Board of Directors. We assume, without so holding, that the agreement is now binding upon the Gazette. A review of this agreement discloses few, if any, benefits to the Gazette.

At all times pertinent to this controversy the circulation of the Gazette was well in excess of that of the Sun. According to the Audit Bureau Circulation the figures are as follows:

| Gazette | Year | Sun |
|---------|------|------|
| 10,415 | 1953 | 5,824 |
| 11,342 | 1954 | 6,797 |
| 11,750 | 1955 | 8,017 |
| 12,465 | 1956 | 8,892 |
| 13,130 | 1957 | 8,650 |

From this we note that, during the five pertinent years, the Gazette increased its circulation by 2715, whereas the Sun was proportionately more successful by increasing a total of 2836. Despite this disparity of circulation, the national advertising revenue was divided equally between the two publications. It is difficult to justify such action in the face of repeated objections by minority stockholders existing since 1942.

The story does not end at this point. By reason of certain increased charges to the Sun under the so-called Phillips-Stearman adjustment of costs, the Sun sustained losses during 1954, 1955 and 1957, in the respective sums of $9,208.06, $13,771.12, and $15,156.35. These losses were reflected on the Gazette's books by an entry charging Carlin's salary and crediting the advance account of the Sun. At the same time Carlin's personal salary as an officer of the Gazette was increased by the exact amount of the loss although, of course, Carlin did not actually receive the increased salary in cash. For the year 1956 the Sun operated at a profit to the extent of $9,799.-80, and this amount was charged to advances to Carlin. In short, it was a one-way street, with the Sun's losses being absorbed by the Gazette, but the profits accruing to Carlin.

■ We have no difficulty applying the controlling principles of law to the facts here presented. As was said in Rowland v. Kable, 174 Va. 343, 6 S.E. 2d 633, 642:

"The authorities are agreed that a director of a private corporation cannot directly or indirectly, in any transaction in which he is under a duty to guard the interests of the corporation, acquire any personal advantage, or make any profit for himself, and if he does so, he may be compelled to account therefor to the corporation. This does not mean that he may not deal with his corporation or sell his property to the corporation if the transactions are open, fair and honest, and the corporation is represented by competent and authorized agents. The unbending rule is that the director must act in the utmost good faith, and this good faith forbids placing himself in a position where his individual interest clashes with his

duty to his corporation. The purpose of the law is to secure fidelity in the director. If, in violation of the general rule, he places himself in a position in which he may be tempted, by his own private interest, to disregard that of the corporation, his transactions are voidable at the option of the corporation and may be set aside without showing actual injury. One who is entrusted with the business of another cannot be allowed to make that business an object of interest to himself."

To the same effect will be found Upton v. Southern Produce Co., 147 Va. 937, 133 S.E. 576; United States v. Carter, 217 U.S. 286, 30 S.Ct. 515, 54 L.Ed. 769; Trayer v. Bristol Parking, 198 Va. 595, 95 S.E.2d 224; Wight v. Heublein, 4 Cir., 238 F. 321, 324. In the last cited case, the Court pointed out that directors are:

"* * * [precluded] from doing any act, or engaging in any transaction in which their own private interest will conflict with the duty they owe to the stockholders and from making any use of their power or of the corporate property for their own advantage."

In Solimine v. Hollander, 128 N.J.Eq. 228, 16 A.2d 203, 217, we are told that "a director or officer of a corporation cannot use corporate assets to acquire, finance, or develop his own individual business project or venture and insist that either the venture or the profits thereof are his own property."

It is clear that Carlin, in his fiduciary capacity as officer and director of the Gazette, has violated the cardinal rules applicable to his position. His unfortunate experiences with his former wife, daughter, and Mardel, as well as his illnesses, are to be regretted, but when his actions are properly challenged in a court of equity, he must adhere to the law applicable thereto.

■■ One of the main defenses advanced by Carlin is that the printing and publication of the Sun was of great value to the Gazette as it eliminated competition in a rapidly growing area. Such a value, if any, is hardly susceptible of determination. Conceding Carlin's position that the publication of the Sun was of some value to the Gazette, we seriously doubt that the value will reasonably approach the loss the Gazette has sustained in printing, and publishing in part, its so-called "friendly competitor." Especially is this true when we know that, despite continuous litigation, Carlin had ample time in earlier years to effect a merger of the two newspapers. Even if court proceedings were pending, there is no suggestion that a merger plan was ever submitted to any court for approval. Moreover, when the Sun was finally sold in 1957, Carlin made no offer to turn the proceeds of sale over to the Gazette. Under the law, the burden rests upon Carlin to prove the *bona fides* of his transactions involving the commingled operation of the Gazette and Sun, and to show the inherent fairness of these transactions from the viewpoint of the Gazette corporation and all parties interested therein. Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281; Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425. This burden Carlin has failed to meet and, indeed, it should be noted that Carlin's burden is increasingly heavy by reason of the power and control exercised by him as a majority stockholder. Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 590, 23 L.Ed. 328.

■ Carlin argues that Mardel is barred from instituting this action under the equitable doctrine of "clean hands", and that Mardel acquired the stock not in good faith but for the vexatious purpose of litigation with the end in view of compelling Carlin to purchase Mardel's stock at an exorbitant price. We agree that Mardel could not be heard to complain as to transactions occurring prior to acquiring its stock interest in November, 1952, but this action seeks no relief for prior acts, other than as to the indebtedness of Carlin to the Gazette in the admitted sum of $80,218.99 as of

December 31, 1952. However, we do not believe that Mardel's motives are of any consequence in this derivative action. Johnson v. King-Richardson Co., 1 Cir., 36 F.2d 675, 67 A.L.R. 1465; Hodge v. United States Steel Corporation, 64 N.J. Eq. 111, 53 A. 553, 555; Young v. Higbee Co., 324 U.S. 204, 214, 65 S.Ct. 594, 89 L.Ed. 890. Certainly for rights accruing subsequent to the acquisition of a minority stock interest, the motives of the minority party are immaterial as long as the action is, in fact, instituted by the minority stockholder and not controlled by other parties.

We advert to the history of Mardel's acquisition of the 48% stock interest. In November, 1949, a corporation known as the R. J. Company entered into an option agreement with the agent for Sara Perine Carlin for the purchase of 1200 shares of Gazette stock in the sum of $115,000, payable over a period of time and subject to certain conditions therein contained. At the time litigation was pending. On July 2, 1951, Sara Perine Carlin executed a final contract of sale as to the 48% stock interest with The R. J. Company, Incorporated, at the stated purchase price, payable in installments, with the stock being placed in escrow. This contract makes specific reference to the pending proceeding in the Circuit Court of the City of Alexandria, wherein Sara Perine Carlin was endeavoring to recover the 1200 shares of stock, and also to a pending proceeding in the United States District Court, presumably the case of Foster v. Carlin, supra. Sara Perine Carlin further agreed to cooperate in any other proceeding to establish the rights of former or present stockholders. Shortly prior thereto, on June 18, 1951, the Circuit Court of the City of Alexandria had decreed that Sara Perine Carlin was entitled to the stock upon the payment of certain liens against same. The court order refers to the fact that Miss Carlin had received an offer of $115,000 for the stock interest, and that she intended to sell same. At the same time Carlin endeavored to convince the Court to enter

a monetary judgment against him for $115,000, rather than require the delivery of the stock, but the Court refused to comply with this request. The Gazette sought a writ of error to the Supreme Court of Appeals of Virginia which was refused. On December 20, 1951, following the delivery of the stock to Miss Carlin, an escrow agreement was executed between Chemical Bank & Trust Company as escrow agent, R. J. Company, Inc., Sara Perine Carlin, and Edgar S. Bayol. This agreement provided that, upon the payment of the balance due evidenced by 85 notes in the sum of $1,000 each, the stock would be delivered by the escrow agent to The R. J. Company, Inc., or its nominee. In November, 1952, Mardel acquired the rights of The R. J. Company, Inc. Mardel also intervened in the case of Foster v. Carlin, supra, and thereafter sought counsel fees, which latter request was denied by District Judge Hutcheson with the appropriate comment:

"In this connection, it is to be observed that the intervenor [Mardel] who purchased the stock could not have been unaware at the time that it would be involved in litigation."

While Mardel became the owner of the stock in November, 1952, the physical delivery of same was deferred until September 21, 1954, at which time Miss Carlin directed the release of the stock.

The corporate stock of Mardel, organized under the laws of the State of Delaware as Mardel, Inc., on November 20, 1952, and the name having been changed to Mardel Securities, Inc., on March 6, 1953, is held by Seymour Schneidman, Veronica Keating, Charles Marsh, and Claudia Marsh, in equal shares. Apparently Charles Marsh had acquired the stock interest in the Gazette from The R. J. Company, Inc., for, on November 21, 1952 (the day following the incorporation), Marsh assigned certain assets, incluing the Gazette stock, to Mardel, Inc.

On December 16, 1952, Mardel filed an action in the Circuit Court of the City of Alexandria seeking the appointment

of a receiver for the Gazette and requesting an accounting of the amounts due by Carlin to the Gazette. A non-suit was taken in this action and it was dismissed on January 4, 1957.

When Mardel acquired its stock interest, it was known that the Gazette was printing the Sun, but the terms, conditions and details were unknown other than what may have been disclosed by the records in prior and pending litigation. Mardel did not see fit to communicate with the management of the Gazette during 1953 as an action had been instituted in the state court in December, 1952, and, as Schneidman contends, no information would have been forthcoming in any event. In 1954, and subsequent thereto, there were many discussions and negotiations between Mardel on the one hand, and Carlin and Phillips on the other hand; all of which were to no avail. Mardel undoubtedly wanted to acquire Carlin's stock and was told that it was not for sale at any price. When Mardel named a "buy or sell" figure, it was rejected by Carlin.

In the course of the many discussions a memo was executed by Carlin and one Ernest Cuneo, a New York attorney representing Mardel, dated August 4, 1954. It will be referred to as the "Cuneo agreement". Apparently the new stock had not yet been issued to Mardel. The pertinent portion of this memo reads as follows:

> "Mardel, Inc. directors will use their best efforts, and Charles Carlin, Jr. and Carlin directors will use their best efforts to formalize the possession, title and acquisition of the Daily Sun by the Alexandria Gazette. Such acquisition shall be nunc pro tunc June 1, 1954, it therefore following that from that day forward, the business having been operated in its ordinary due course, Charles Carlin, Jr. shall not be personally liable for any ordinary losses sustained by him in the operation of Daily Sun between June 1, 1954, forward to the date of action of the Board, it being understood that loss-

es are running at about $1250 a month, and to that extent it is contemplated that there would be offset of three months more or less in the sum of $3750. It is understood that no salary shall be credited to said Carlin from June 1, 1954, for the Daily Sun operation."

 Carlin insists that the Cuneo agreement bars Mardel's action for any losses subsequent to June 1, 1954. The Court is not in accord with this view. The entire Cuneo memo was conditioned upon the acquisition of the Sun by the Gazette—a condition that was never realized. It further referred to "best efforts" on the part of the directors. Moreover, under any construction of the memo the offset would be limited to $3,-750, and then only to "ordinary" losses. The Cuneo memo was thereafter repudiated by Schneidman by letter dated March 25, 1955, when he received the annual financial report which referred to a "stockholders' agreement." That Carlin, Phillips, and Stanton misinterpreted the legal effect of the Cuneo memo is apparent. The effect of this document was predicated upon the acquisition of the Sun, without which it plays no part in the case.

The present action was instituted on May 6, 1957, following a formal notice from Mardel to the Gazette and its directors dated March 13, 1957, advising as to the intentions of the minority stockholder to institute an action against Carlin, unless such action was taken by the corporation on or before April 15, 1957. The corporation took no action to collect the indebtedness, or any part thereof, from Carlin, although, on or about April 1, 1957, Carlin made a payment "on account" when he settled for the sale of the Sun.

 It does not appear that Schneidman, in his capacity as President of Mardel, was ever formally authorized by Mardel's directors to institute the action now before the Court. During the course of trial, this question was raised by counsel for the defendants for the

first time. Schneidman did state that Mardel's directors had discussed the matter and verbally authorized the action. On October 15, 1958, which was the third day of the trial, the directors executed a ratification of Schneidman's actions in instituting this suit, and thereafter, on October 20, 1958, a resolution to this effect was adopted by Mardel's directors. We think it unnecessary to consider the effect of any ratification as the issue was not raised by the pleadings or any amendment thereto. Rule 9(a) of the Federal Rules of Civil Procedure precludes the raising of this issue during the course of trial. Furthermore, the authority of the president in such matters is generally presumed and the burden rests upon the party questioning same to prove lack of authority in such matters. 13 Am.Jur., "Corporations", § 901, 928. The action was, therefore, properly instituted.

■ Subsequent to the execution of the so-called Cuneo agreement in August, 1954, there were a number of conferences between Schneidman, Phillips, and counsel representing Mardel. Thereafter, the physical possession of the stock came into the hands of plaintiff and, for the first time, Mardel became the record owner of the stock. At a meeting held on March 21, 1955, the minority stockholder was represented by Cuneo and Schneidman. The friction was apparent. When Phillips sought to ascertain whether Mardel desired representation on the Board of Directors, Cuneo replied in the negative contending that the entire proceedings were illegal as no by-laws existed until adopted at the stockholder's meeting of March 21, 1955, and that no decision would be made pending an extensive audit. The following year, on March 5-6, 1956, the minority stockholder expressed a desire to be represented on the Board of Directors, whereupon the majority voted against a motion to permit such representation. At a subsequent meeting on March 6, 1957, shortly prior to the institution of this action, the minority stockholder again requested representa-

tion on the Board of Directors, but the majority insisted that no such action would be taken until and unless the minority and majority resolved all differences between them. This is rather typical of the non-cooperative attitude which existed on both sides. But non-cooperation on the part of a minority stockholder does not *per se* bar the stockholder's rights in a derivative action. Counsel for the defendant would have the Court adopt a rule that the failure of a minority stockholder to accede to the wishes of the majority is evidence of a violation of the equitable doctrine of "clean hands."

Discussions as to the purchase of the Sun by the Gazette resolved itself into a stockholder's meeting on November 8, 1956. Prior to this meeting Carlin had received seven inquiries manifesting interest in acquiring the Sun. Prompted by a letter indicating a possible purchase price of $150,000, the stockholders were convened. Many words were exchanged and finally the parties agreed that an appraiser would be selected to evaluate the Sun. A later meeting on February 11, 1957, discloses the parties still "jockeying for position" with Carlin wanting to know the price the Gazette would give for the Sun, but refusing to name a price at which he would be willing to sell, and Mardel insisting upon more information prior to indicating any approval or disapproval of purchase by the Gazette. The last stockholder's meeting prior to the commencement of this proceeding was held on March 6, 1957, at which time no litigation was pending between the parties. All knew that Carlin was going to sell the Sun, although the terms and conditions of said sale were not considered at the meeting, although presumably such terms and conditions had been the subject of discussion between Carlin and the Sun's purchaser as the final contract bears the date of March 13, 1957, and Phillips stated at the meeting that negotiations were in progress at the time. The meeting referred to resulted in a discussion of the charges made against Carlin for

the operation of the Sun which, according to the books as of December 31, 1956, had reached the admitted sum of $138,-352.94. The minority wanted to know when and how this item was to be paid, what would be done as to other allegedly proper charges not included on the books, whether interest had or would be charged on the admitted indebtedness, and how and by whom the charges were determined. As previously noted, the minority again requested representation on the Board of Directors, but without success.

The complaint, as amended, and the testimony adduced at the trial adequately disclose compliance with the requirements of Rule 23(b) of the Federal Rules of Civil Procedure. The Gazette ceased to print the Sun on April 16, 1957, and, except for the provisions of the sales contract between the Gazette and Sun, the two publications have been divorced since that date.

We find no fault with the principles supported by defendants' authorities which hold, in substance, that where a stockholder acquires an interest for the purpose of litigation, he cannot, as a rule, be heard to complain as to causes of action arising prior to the acquisition date. While recognizing that there is a conflict of authority as to this point, we are not required, under the facts here presented, to determine this issue as the action seeks no redress for Carlin's actions prior to November, 1952, when Mardel purchased the stock. Dimpfell v. Ohio & M. R. Co., 110 U.S. 209, 3 S.Ct. 573, 28 L.Ed. 121; Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528; Home Fire Ins. Co. v. Barber, 67 Neb. 644, 93 N.W. 1024, 60 L.R.A. 927; Pollitz v. Gould, 202 N.Y. 11, 94 N.E. 1088, 38 L.R.A., N.S., 988.

It is urged that, since Mardel elected to sue only Carlin and not the remaining directors, plaintiff is estopped from maintaining this action. We do not agree, as Mardel was at liberty to sue any one or more of the directors. Furthermore, Carlin was and is a qualified attorney—although not practicing as such—and his prior actions over a period of years clearly demonstrated that his word was the corporate word, his actions were the corporate actions, and his vote constituted the prevailing vote. It is acknowledged that contracts between a corporation and its officers are not void, but merely voidable at the option of the corporation. The presumption is that such transactions are invalid. Deford v. Ballentine Realty Corp., 164 Va. 436, 180 S.E. 164; Saunders v. Russell's, Inc., 173 Va. 125, 3 S.E.2d 193. Where the corporation, dominated by the president and majority stockholder, declines or fails to execute such an option after notice, such rights are reserved to the minority stockholder in an appropriate action. Legal fraud in the management of the Gazette, as related to the operation of Carlin's personal asset (the Sun) is clearly established by the evidence.

We arrive, finally, at the formula to be adopted in ascertaining Carlin's indebtedness to the Gazette. Understandably this involves many complications. At the outset we start with the admitted indebtedness due by Carlin as of December 31, 1952, in the sum of $80,218.99. We see no justification in not charging Carlin with the lawful rate of interest, computed on a yearly basis, but not compounded, from that date forward. Nor is there justification for increasing Carlin's salary to offset the Sun's annual losses. Adopting a charitable view to Carlin's position, we think that, in general, the computation should be based upon the assumption that the production of the Sun by the Gazette was being undertaken as an accommodation. This computation should cover the period from January 1, 1953, to and including March 31, 1957. As many of these figures are available in a special report made by Stanton, Minter & Bruner, certified public accountants, counsel are directed to confer and, within thirty (30) days from this date, endeavor to stipulate with respect to the agreed items under the formula now adopted by the Court, but nei-

ther party shall be required to accept the figures as determined by the accountants. As to the disputed items, if any, the matter will be referred to a master for determination, in which event the Court will select a firm of accountants, not recommended by any of the parties, to assist the master in arriving at the total indebtedness due by Carlin to the Gazette.

Manifestly, in this type of action counsel for the plaintiff should be allowed a substantial fee for services rendered in behalf of the corporation. The recovery is, as noted, for the benefit of the corporation. In the absence of any agreement, and without knowledge as to the additional work required before the master and perhaps an appellate court, the amount of such fee should be reserved for further determination, but any decree should specify that the Court will make an appropriate allowance after the exhaustion of all appeals.

At the proper time a decree may be presented referring the matter to a master, if necessary, and otherwise carrying into effect the intent of this memorandum, which is adopted by the Court in lieu of specific findings of fact and conclusions of law.