In re NELCO, LTD., Debtor.

**Ezra H. Cohen, Trustee, Plaintiff,**

v.

**Un–Ltd. Holdings, Inc., and Richard A. Nelson, Defendants.**

**Bankruptcy No. 96–31500–T. Adversary No. 97–3204–T.**

United States Bankruptcy Court, E.D. Virginia, Richmond Division.

Dec. 27, 1999.

Douglas E. Ernst, Troutman Sanders L.L.P., Atlanta, GA, Michael W. Smith, Paul W. Jacobs, II, August C. Epps, Jr., Christian & Barton, L.L.P., Richmond, VA, for Plaintiff.

Everette G. Allen, Jr., W.R. Baldwin, III, Michael P. Falzone, Hirschler, Fleischer, Weinberg, Cox & Allen, P.C., Richmond, VA, for Defendants.

### MEMORANDUM OPINION

DOUGLAS O. TICE, Jr., Chief Judge.

The debtor Nelco, Ltd., filed a chapter 11 case on March 25, 1996, and operated as debtor in possession until the case was converted to chapter 7 on January 7, 1997. During the chapter 11 case debtor sold most of its tangible assets. Plaintiff chapter 7 trustee brings this adversary proceeding asserting monetary damages against Un–Ltd. Holdings, Inc., debtor's parent corporation, and Richard A. Nelson, president and sole director of Nelco and Un–Ltd.

Trial on the trustee's amended complaint was held in March 1999. Subsequently, the parties submitted briefs, and on June 29, 1999, the court heard closing argument.

### The Complaint

The following counts of the amended complaint remain for decision:

Count I. Violation of the automatic stay by Un–Ltd. because of its failure to turn over the 1995 tax refund due to the Nelco estate under the consolidated income tax return of Un–Ltd. and its subsidiaries.

Counts II and III. Recovery from Un–Ltd. of 1995 and 1996 tax refunds due to Nelco under the consolidated income tax returns.

Counts V and VI. Recovery from Un–Ltd. and Nelson, respectively, of the amount of the 1995 tax refund as a breach of fiduciary duty based upon their failure to turn over the refund to debtor or to the trustee.

Count VIII. Recovery from Nelson of an $800,000.00 bonus that Nelco paid in December 1995.

Count IX. Recovery from Un–Ltd. of $6,087,289.22 alleged to be loans by Nelco to Un–Ltd.

Count X. Recovery of 1995 and 1996 tax refunds from Un–Ltd. and bonus payment received by Nelson under theory of common law unjust enrichment.

Count XI. Trustee's objection to Un–Ltd.'s proof of claim.

Count XII. Setoff and recoupment to the extent any of defendants' claims in the case are allowed.

### Summary of Decision.

For reasons stated in this opinion, the court makes the following rulings on the trustee's complaint:

Count I. Un–Ltd. willfully violated the automatic stay by failing to turn over the 1995 consolidated tax refund to Nelco, and the trustee will be granted judgment against Un–Ltd. for the trustee's reasonable fees and expenses incurred in recovery of this refund.

Counts II and V. The trustee is granted judgment against Un–Ltd. in the amount of $477,347.17 for the consolidated group 1995 tax refund.

Count III. The trustee is awarded the consolidated group 1996 tax refund in the amount of $2,481,160.00.

Count VI. The trustee is granted judgment against Nelson in the amount of $477,347.17 based upon Nelson's breach of fiduciary duty with respect to the 1995 tax refund.

Count VIII. The trustee's claim to recover Nelson's bonus payment of $800,000.00 is dismissed.

Count IX and X. The trustee is granted judgment against Un–Ltd. in the amount of $6,087,289.22 for loans by Nelco to Un–Ltd. Count X is dismissed as to Nelson.

Count XI. The trustee's objection to Un–Ltd.'s amended proof of claim is sustained and the claim disallowed.

Count XII. Count XII is dismissed as moot.

1. This opinion incorporates previous opinions of the court entered on April 10, 1997, De-

### Findings of Fact [1]

### BACKGROUND.

Debtor Nelco, Ltd., operated a successful computer leasing business until March 1996, when its management learned that a large number of Nelco's leases were fraudulent and worthless. Nelco and NL Investments, Inc., are wholly owned subsidiaries of defendant Un–Ltd. Holdings, Inc. Defendant Richard A. Nelson is president and sole director of Un–Ltd. and its subsidiaries. Nelson is also Un–Ltd.'s controlling shareholder with other shares owned by members of his family.

The fraudulent leases have been described throughout this bankruptcy case as the stealth leases. This lease portfolio represented in excess of $300,000,000.00 in lease financing debt, which had been funded by several banks. The fraud was perpetrated by a former employee of Philip Morris Companies and another individual who have since been convicted of their crimes. Both Nelson and the banks had believed the leases covered computer equipment used by a Philip Morris entity and that the payment of the leases was an obligation of Philip Morris. Actually, there were no computers, and Philip Morris was not involved in the transactions.

With the collapse of a significant portion of its assets, Nelco filed a chapter 11 bankruptcy case on March 25, 1996. Nelco's principal and its counsel originally hoped to salvage the business. However, it soon became apparent that Nelco would have to liquidate its remaining assets, comprised mostly of computer leases. After Nelco had liquidated substantially all of its assets, the unsecured creditors' committee and three banks moved the court either to appoint a trustee or to convert the case to

cember 1, 1998, and February 16, 1999.

chapter 7. By order entered January 7, 1997, the case was converted to chapter 7. Plaintiff Ezra H. Cohen was subsequently elected trustee in bankruptcy. He filed the instant adversary proceeding on December 8, 1997. The amended complaint before the court was filed on October 22, 1998.

## NELCO AND UN–LTD.

Nelco was formed by Nelson in 1979 and, excluding the fallout from the stealth lease fraud, operated a profitable computer leasing business that produced large amounts of cash. The company was highly leveraged, using financing from several banks. In the 1980's the company entered into a line of credit relationship with Signet Bank (then known as Bank of Virginia). Also in the 1980's Nelco sought other investments in which to use its cash profits. These other ventures included real estate, yogurt and dessert businesses, and a short-term personal computer rental company. Nelco's other business ventures did poorly, in contrast to the company's core leasing business.

In 1989, Nelco's accounting firm, Price Waterhouse, recommended that Nelco divest its non-leasing activities by creating a holding company and a sister company that would hold the non-leasing businesses. Accordingly, Un–Ltd. was created as a holding company for Nelco and NL Investments. Nelco transferred the non-leasing ventures to NL Investments during 1990 and 1991.[2]

## LINE OF CREDIT; UN–LTD.'S PROOF OF CLAIM.

In 1992 or 1993, Un–Ltd. and Nelco put into place a system of intercompany transactions that management referred to as an unlimited line of credit (referred to throughout this opinion as the LOC). This course of dealing among the companies arose out of the fact that Nelco produced profits and a positive cash flow while the related companies lost money. In essence, the LOC allowed Nelco to finance the deficit operations of Un–Ltd. and NL Investments. It also allowed Nelco to fund these operations without breaching restrictions on intercompany loans or dividends that had been imposed under the Signet Bank line of credit.[3]

There was no LOC agreement as such. Rather, for the existence of an LOC the defendants rely upon (1) a form demand note dated January 1, 1993, bearing interest at the prime rate and with the heading "Un–Ltd. Holdings Inc. LINE OF CREDIT NELCO, LTD.";[4] (2) a summation of approximately 40 general ledger accounts on Nelco's books; and (3) a spreadsheet summary of these accounts maintained by a company accountant.

The 40 general ledger accounts that comprise the LOC calculation can be sum-

---

**2.** The other ventures that were made subsidiaries of NL Investments were: Pocoshock Associates, Limited Partnership; Yogurt Enterprises of Virginia, Inc.; After Dinner Distributors, Inc.; and PC Consignment Center, Ltd.

**3.** As the court understands the defendants' position, Un–Ltd. was the lender in the intercompany line of credit and Nelco the borrower. The rationale for this was that after Nelco advanced cash to an affiliate, that cash was loaned back to Nelco to the extent it was not needed elsewhere. According to the trustee's expert witness, the LOC was not a line of credit and certainly was not a typical line of credit between a lender having cash to loan and a borrower who requires a regular source of funds. However, "line of credit" is not used as a term of art in this opinion, and I find it unnecessary to decide whether the LOC was in fact a line of credit.

**4.** Although the note is signed by Nelson, individually, and does not reflect Nelco as maker, the note is denoted as a line of credit for Nelco and promises to pay "all advance balances lent to Nelco, Ltd."

marized in four general categories of accounts:

 (1) Due (to)/from Un–Ltd. ((liability)/asset) (general ledger account 11770),

 (2) Estimated Tax deposits (asset),

 (3) Current taxes payable (liability),

 (4) Deferred taxes payable (liability).

The due from Un–Ltd. account reflected cash advances or loans from Nelco to the affiliated corporations. Sometimes these advances were made by Nelco to Un–Ltd. for the use of another affiliate, and other times Nelco issued checks directly to NL Investments (or its subsidiaries). The current balance of this receivable on Nelco's books, which represents total loans outstanding from Nelco to Un–Ltd., is $5,808,547.22.

The estimated tax deposits accounts reflected Nelco's estimated tax payments to federal and state authorities. Nelco actually made the tax payments by check to Un–Ltd., which in turn paid the taxing authorities. Current taxes payable reflected unpaid amounts due to the tax authorities within one year. Accordingly, these two classes of accounts essentially were canceled out each year when the taxes were paid.

Nelson's deferred tax liability resulted from temporary timing differences in the company's methods of asset depreciation between that allowed for income tax purposes and that recognized for book purposes under generally accepted accounting principles (GAAP).[5] Beginning in 1993,

Nelco made a rough estimate of taxes each month and adjusted income tax expense, current income taxes payable and deferred taxes payable, which were recorded on its books.[6] At the end of each year, Nelco's accounting firm prepared the consolidated tax return, made a more accurate estimate of the deferred tax liabilities, and adjusted the books accordingly. Although monthly entries were made in the deferred taxes payable accounts, Nelco did not actually make corresponding monthly payments of deferred taxes to Un–Ltd. Rather, Nelco made payments to the affiliates on an as needed basis; these payments were entered as loans in the due from account.

The liquidation of Nelco's assets after it filed bankruptcy in 1996 eliminated the temporary timing differences in depreciation at a time when Nelco's marginal tax rate was zero. Accordingly, at that point neither Nelco nor the consolidated group had any further liability to pay deferred taxes to the taxing authorities. However, Nelco's books still reflect the previously entered estimates in deferred taxes payable of an amount just over $8,000,000.00.

At no time did Nelco agree, either under the LOC or otherwise, to pay Un–Ltd. for deferred taxes that are not in fact payable to taxing authorities. Therefore, with the elimination of Nelco's liability to pay deferred taxes following the liquidation of its assets, Nelco has no obligation to pay Un–Ltd. any sum in the deferred taxes accounts that remain on the books.

---

**5.** Because deferred taxes is an accounting concept, it is governed by generally accepted accounting principles and not tax law. The tax law provides for a greater rate of depreciation in an owned asset's early years; this increases the taxpayer's expense, reduces income and consequently reduces taxes due in these early years. Thus, deferred taxes confer a benefit upon a taxpayer that allows the deferral of tax to future years. As was the case with Nelco, deferred taxes payable is management's estimate of what will be due in the future. Because deferred taxes relate to future events, the estimate of deferred taxes payable is subject to change based upon future changes in a taxpayer's circumstances.

**6.** Based upon these entries, defendants assert that the estimates for deferred taxes were recorded on Nelco's books in the deferred taxes payable accounts as a liability to Un–Ltd. rather than to the tax authorities.

*Un–Ltd.'s Proof of Claim.*

Defendant Un–Ltd. filed an amended proof of claim asserting that Nelco is indebted to Un–Ltd. in the amount of $1,121,993.00. The claim represents Un–Ltd.'s calculation of a net LOC balance due *from* Nelco to Un–Ltd. based upon offsetting the due from Un–Ltd. account against the deferred taxes payable accounts.[7] (If Nelco's obligation to pay the deferred taxes payable accounts remains in place, then the amount Nelco owes Un–Ltd. for deferred taxes payable exceeds the amount Un–Ltd. owes Nelco in the due from account.)

## TAX ALLOCATION AGREEMENT; 1995 AND 1996 INCOME TAX REFUNDS.

Since its formation in 1989, Un–Ltd. has filed consolidated federal and state income tax returns on behalf of itself, Nelco, NL Investments and its subsidiaries. On November 30, 1993, the three corporations executed a document entitled "TAX ALLOCATION AGREEMENT" (TAA). This document states that it is effective "as of January 1, 1989," and replaced an earlier identical agreement which had been lost. In general, the TAA provides for the allocation of income tax related liabilities and benefits among the affiliated corporations. The following is an excerpt of pertinent provisions of the TAA:

1. Definitions. . . .

1.01. Consolidated Return. Any federal or state income tax return where parent and at least one subsidiary file.

1.02. Subsidiary Return. The tax return of a subsidiary prepared on a stand-alone basis.

1.03. Tax Due. All current and deferred federal and state income taxes, alternative minimum taxes, penalties, interest, and any other amount properly included as being due for the return in question net of all available credits and deductions. Tax due may not be less than zero.

1.04. Benefit Amount. The tax savings generated through either net operating losses or credits generated by a Member of the Affiliated Group.

1.05. Loss Company. Any Member whose separate return shows a net operating loss.

2. Estimated Tax Payments. Estimated tax payments will be made by the Parent through loans from [Nelco]. These loans will be recorded in the records of the Parent and [Nelco] through the use of the "Due (To)/From" account.

3. Filing Consolidated Income Tax Returns. The Affiliated Group shall file a consolidated return for each taxable year with respect to which this Agreement is in effect and for which the Affiliated Group is required or permitted to file a consolidated return, unless the parties elect not to file a consolidated return by mutual consent. [Nelco]

7. Un–Ltd.'s claim is calculated as a summary of the following Nelco account balances which make up the LOC:

| Account | Typical Balance | Amount |
|---|---|---|
| Due from/(to) Un–Ltd. | Positive (Asset) | $5,355,577.00 |
| Tax Deposits | Positive (Asset) | 1,540,517.00 |
| Current Taxes Payable | Negative (Liability) | - |
| Deferred Taxes Payable | Negative (Liability) | (8,018,087.00) |
| | | |
| Net Obligation | | $(1,121,993.00) |

(Plaintiff's Ex. D–16.)

shall execute and file any consents, elections, and other documents required or appropriate for the proper filing of such returns. Further, [Nelco] agrees to absorb the cost of all accounting, administrative, technical and any other services required to complete the consolidated return.

4. Allocation Of Tax Liability/Benefit Amount. The Affiliated Group shall apportion its consolidated federal state income tax liability among the members based on the following method:

Step 1: The tax due per subsidiary returns is to be computed.

Step 2: The consolidated income tax provision is calculated.

Step 3: Either subsidiary is required to pay its own current tax liability to the Parent as calculated per the subsidiary return. In the case of a loss company, the Parent is required to pay the Subsidiary their current benefit amount, if any, as calculated below. This benefit amount will be recorded by the Subsidiary as income.

Example A. If Subsidiary1 has a tax due of 100 and Subsidiary2 has a tax due of (25), and the consolidated return shows a tax due of 80, Subsidiary1 will pay the Parent 100 and the Parent, in turn would pay Subsidiary2 20 (the difference between the tax due per Subsidiary1's subsidiary return and tax due per the consolidated return.)

Example B. If Subsidiary1 has a tax due of 100 and Subsidiary2 has a tax due of (20), and the consolidated return shows a tax due of 71, Subsidiary1 will pay the parent 100 and the Parent, in turn would pay Subsidiary2 29.

5. This Agreement will apply to all taxable years for which the affiliated group files a consolidated return, and shall terminate, except as otherwise specifically provided herein with respect to any party, when the parties' cease to be Members of the Affiliated Group. Notwithstanding termination of this Agreement or the filing of consolidated returns, this Agreement shall continue in effect with respect to any payment or refunds due or other matters relating to all taxable periods for which this Agreement is in effect.

This Agreement contains the entire understanding of the parties with respect to the subject matter contained herein. No alteration, amendment or modification of any of the terms of this Agreement shall be valid unless made by an instrument signed in writing by an authorized officer of each party of this Agreement.

As the court ruled in the opinion entered February 16, 1999, Nelco was the sole source for the consolidated group's estimated tax payments made pursuant to the TAA. At no time did either Un–Ltd. or NL Investments fund tax payments.[8] As previously described, Nelco made its tax payments to Un–Ltd., which filed the consolidated returns and paid the taxes to IRS.

After Nelco filed bankruptcy, Un–Ltd. on behalf of the consolidated group filed a tax return for 1995. Total payments and credits on the return came from a Nelco

---

**8.** Neither Un–Ltd. nor NL Investments had an earnings history that would have required them to pay estimated taxes. Un–Ltd.'s losses for the tax years 1995 and 1996 were $1,697,098.00 and $2,924.00, respectively. NL Investments reflected a positive income in 1995 of $865,154.00 and a loss of $796,537.00 in 1996. NL Investments' 1995 income was a result of debt cancellation by Un–Ltd. Intercompany debt forgiveness among consolidated affiliates does not result in a taxable event. Therefore, NL Investments had either zero or negative taxable income during all periods in question.

check (to Un–Ltd.) in the amount of $1,050,000.00 plus a prior year Nelco credit of $269,908.00. The return called for a refund in the amount of $515,704.00. At the time the return was filed with IRS the estimated 1995 refund amount was recorded on Nelco's books as a receivable. Similarly, the estimated 1995 refund was listed as an asset of the debtor on its debtor in possession monthly reports filed with the court. On November 1, 1996, the IRS issued the 1995 refund payable to "Un–Ltd. and Subs" in the amount of $477,347.17.[9] Un–Ltd. deposited the refund in its Signet Bank corporate account. Subsequently, the funds were transferred to a newly-established account opened by Nelson on behalf of Un–Ltd. at the Strong Funds.

Directly after receipt of the 1995 refund, Nelson sought advice from Un–Ltd.'s accounting firm, KPMG Peat Marwick (KPMG), concerning the appropriate allocation of the refund. In a letter dated November 5, 1996, KPMG expressed the opinion that Nelco was due approximately $306,744.00 of the 1995 refund less interest and penalties of $38,357.00 or a net of $268,387.00.

At a deposition given by Nelson on November 8, 1996, he was questioned about the apportionment of the 1995 refund between Nelco and Un–Ltd. Nelson did not reveal that the refund had been received by Un–Ltd. four days earlier. Nelco's chapter 11 disclosure statement, signed by Nelson and filed while it was operating as debtor in possession, estimated that $250,000.00 of the 1995 refund would be remitted to the Nelco estate.

From November 1996 through conversion of the case in January 1997, neither Nelson nor any other employee of Un–Ltd.

disclosed that the 1995 refund had been received and was being held and used by Un–Ltd. The receipt of the refund by Un–Ltd. was discovered only after investigation by Nelco's trustee.

In November 1996, Un–Ltd. spent over $200,000.00 of the 1995 refund. On January 7, 1997, when the case was converted, Un–Ltd. did not return the remainder of the refund to Nelco because Un–Ltd. had spent it all.

The 1996 tax refund results from the 1996 tax return for the consolidated group that reflected the carryback of over $70,000,000.00 in losses arising out of the stealth fraud. The return carried these losses back to tax years 1993, 1994 and 1995 for a total refund of $2,481,160.00. Un–Ltd.'s amended proof of claim includes the amount of $570,000.00 based upon its alleged allocated portion of this refund.

## NELSON'S 1995 BONUS.

In June 1995 Nelco paid a $300,000.00 bonus to Nelson. In December 1995, Nelson, as the sole director of Nelco, authorized a $1,100,000.00 total bonus for 1995 to himself, and on December 27, 1995, Nelco paid Nelson the remaining $800,000.00 of the authorized bonus. At the time the $800,000.00 bonus was paid, Nelson believed, and the books of Nelco reflected, that the company was profitable in 1995.

The stealth fraud was discovered in March 1996. If the phantom profits which were the result of the stealth fraud were to be retroactively removed from Nelco's 1995 earnings, then Nelco would not have generated a profit for 1995 and would have been insolvent when Nelson's $800,000.00 bonus was paid in December 1995.

9. The $515,704.00 refund shown on the 1995 tax return was reduced by a liability of Un–

Ltd. for interest due for the 1994 tax year.

Additional findings of fact are stated in the discussion section of this opinion.

### *Discussion and Conclusions of Law.*

### ISSUES.

The counts of the trustee's amended complaint raise three broad categories of issues which the court will characterize as:

(1) Counts IX and XI relating to alleged loan indebtedness of Un–Ltd. to Nelco. This is the central dispute in the case as the court must determine the effect, if any, of a line of credit (LOC) allegedly extended from Nelco's parent Un–Ltd. to Nelco and offsetting loans from Nelco to Un–Ltd. and its other subsidiaries. The LOC spills over into the tax refund issues and also includes the trustee's objection to Un–Ltd.'s proof of claim.

(2) Counts I–III, V, VI and X relating to tax refunds for 1995 and 1996.

(3) Counts VIII and X relating to defendant Nelson's $800,000.00 bonus payment from Nelco in December 1995.

Count XII, setoff, comes into play only if the court makes a monetary award to the defendants.

### THE EVIDENCE.

The trustee seeks substantial monetary recovery from debtor Nelco's parent corporation and its principal officer, director and stockholder. Additionally, the trustee claims that all tax refunds that followed from Nelco's collapse are assets of the chapter 7 estate. Nelco was the only cash producing entity among several affiliated corporations, and the major issues presented arise out of the accounting system adopted by Nelco and its affiliates. It is undisputed that the books of the related entities were structured to permit use of debtor's cash as needed by any entity. Accordingly, Nelco's accounting records comprise the most important evidence in this case.

Nelco's books were maintained during all years relevant to this case by Nelco's own staff under the supervision of its chief financial officer, John Kessenger. During the years immediately prior to the discovery of the stealth fraud and Nelco's ensuing bankruptcy, the company employed KPMG as its outside public accounting firm and auditor. For the years 1992 through 1994, KPMG issued audit reports for Nelco. The stealth fraud was discovered before KPMG issued Nelco's 1995 audit report, and as a result of this discovery, KPMG declined to issue its 1995 report. Additionally, by letter dated March 20, 1996, KPMG advised Nelco that KPMG could no longer "continue to be associated with" the consolidated financial statements of Nelco for years ended 1993 and 1994 and that the statements should no longer be relied upon. (Plaintiff's Ex. 25.) Nevertheless, Nelco's financial statements for years 1992, 1993, 1994, and 1995 present in summary form the company's financial operations (profit and loss statements) and assets and liabilities (balance sheets) as they appeared in Nelco's accounting records for those years. In this case, the defendants rely primarily on Nelco's books and these annual financial statements in addition to testimony of Nelson and other employees of Nelco.

The trustee's principal evidence was presented by Guy Davis, who qualified as an expert in forensic accounting. Mr. Davis acknowledged at trial that he had limited experience in the field of auditing. An audit consists in large degree of sampling and testing a client's accounting records for accuracy. However, Davis stated that he had examined *each* transaction that went into what is referred to in this case as the LOC. The court rejects the argument of defendants' counsel that Davis'

lack of auditing experience detracts from his report and evidence. Davis' examination of each transaction in the LOC goes beyond the scope of an audit, and the court gives substantial weight to his evidence.

## COUNT IX—TO RECOVER $6,087,289.22 (THE $6 MILLION CLAIM) AND COUNT XI—TRUSTEE'S OBJECTION TO UN–LTD.'S PROOF OF CLAIM.

The trustee's $6 million claim against Un–Ltd. arises out of the cash disbursed by Nelco to Un–Ltd. and its other affiliates. In practice, during the years preceding Nelco's bankruptcy, an affiliate in need of cash would request money from Nelco, which would then issue a check either to Un–Ltd. or directly to the affiliate. Nelco recorded these transfers in the due from Un–Ltd. account as an asset (loan receivable). In this fashion, Un–Ltd. and the affiliates incurred an outstanding loan debt to Nelco of $5,808,547.22. The trustee claims this sum under Count IX plus an interest adjustment in the amount of $278,742.00, a total claim of $6,087,289.22.

Un–Ltd.'s defense to this claim, along with Un–Ltd.'s proof of claim against Nelco for yet another $1,121,993.00, depends on Un–Ltd. establishing, either by contract or by a course of dealing between the two entities, that Nelco remains obligated to Un–Ltd. for Nelco's monthly deferred taxes payable accounts.

As the court has previously found, the deferred taxes that are at issue in this case resulted from temporary timing differences in Nelco's methods of asset depreciation between that allowed for income tax purposes and that recognized for book purposes under generally accepted accounting principles. *See supra* note 5.

Accordingly, Nelco's book liability to Un–Ltd. for deferred taxes payable represents previous estimates of future tax liability. It is this liability that presents the major issue in this case. As a result of the stealth leases and the liquidation of Nelco in bankruptcy, neither Nelco nor Un–Ltd. had any further liability to the federal or state tax authorities for future taxes after 1996. However, Nelco's books still reflect what defendants claim is its obligation to pay deferred taxes to Un–Ltd. in a sum just over $8,000,000.00. The defendants' position is that Nelco is obligated to Un–Ltd. for the amounts originally estimated for deferred taxes even though Nelco paid all current taxes and no longer has any future tax liability. The defendants assert that Nelco's obligation is irreversible and that Nelco's loans to Un–Ltd. and affiliates (*i.e.*, the $6 million claim represented by the due from Un–Ltd. account) were actually partial payments on Nelco's deferred tax obligation. In addition, Un–Ltd.'s proof of claim includes the sum of $551,993.17, which represents the claimed balance of Nelco's obligation to Un–Ltd. for deferred taxes payable in excess of the loans owed Nelco in the due from Un–Ltd. account.

### Statute of Limitations.

■ Defendants raise the statute of limitations as an affirmative defense to the $6 million claim. They argue that even if the court agrees with the trustee that Un–Ltd. is not entitled to keep the intercompany transfers, the trustee still should not prevail to the extent the loans made by Nelco are barred from recovery by the Virginia limitations period for oral contracts. The court rejects this argument.

■ Under Virginia law an oral contact has a three-year statute of limitations, and a written contract has a five-year statute of limitations. *See* Va.Code § 8.01–246. In order for a writing to satisfy the statute of limitations writing requirement, the contract "must show on its face a complete

and concluded agreement between the parties. Nothing must be left open for future negotiation and agreement: otherwise, it cannot be enforced." *Marley Mouldings, Inc. v. Suyat,* 970 F.Supp. 496, 498 (W.D.Va.1997) (quoting *Newport News H. & O.P. Dev. Co. v. Newport News St. Ry. Co.,* 97 Va. 19, 32 S.E. 789, 790 (1899)).

In designating the longer limitations period for written contracts, the Virginia legislature reasoned that written contracts are more reliable. *See Marley Mouldings,* 970 F.Supp. at 499. When a contract is written, the material terms are clear, and a court need only refer to the written agreement itself to determine the intention of the parties and the terms of the contract. *See id.* In contrast, a shorter limitations period is applied to oral contracts because they are less reliable: "the effect of lost evidence, faded memories, and missing witnesses is less prejudicial to the adjudication of the claim [on a written contract] than where parole evidence, memories, and witnesses will be relied upon to determine the actual terms of an oral contract." *Id.*

In *Newport News H. & O.P. Dev. Co.,* 32 S.E. at 790, the Virginia Supreme Court concluded that a resolution passed by a corporation's board of directors did not constitute a written contract for limitations purposes because aspects of the resolutions required further negotiation among the parties. Thus, even though the writings were sufficient to satisfy the statute of frauds writing requirement, the fact that the writing itself was not complete made it insufficient for statute of limitations purposes. *See id.*

Similarly in *Marley Mouldings,* 970 F.Supp. at 499–500, the contract was found not to satisfy the writing requirement because the court would need to refer to external evidence to determine the consideration to be paid and the performance necessary to fulfill the contract.

The terms of the loan contract between Nelco and Un–Ltd. are clear and leave no room for negotiation: each loan request form issued by Un–Ltd. and the affiliates states a sum specific and is signed by the companies' financial officer, John Kessenger, or an employee under his control. Nelco recorded all intercompany transfers as receivables in the due from Un–Ltd. account, and the majority of these cash transfers were designated as loans. As a matter of law in Virginia, where there is no agreed repayment date of an obligation to repay money, it is deemed to be payable upon demand. *See McComb v. McComb,* 226 Va. 271, 307 S.E.2d 877, 883 (1983). Finally, these loans were recorded on a spreadsheet that showed interest was applied in a consistent manner. The present writings found in the business records of Nelco and Un–Ltd. evidence a complete and concluded agreement that leaves nothing open for future negotiation. These records are sufficient for the court to find that Nelco's loans are supported by written contract. Accordingly, the five-year statute of limitations period of Va.Code § 8.01–246 is applicable.

Because all of the loans which the trustee seeks to recover were made less than five years before this case was filed on March 16, 1996, none of the loans are barred by the statute of limitations. *See* 11 U.S.C. § 108(a).

### *Status of Deferred Taxes.*

The parties bitterly dispute the appropriate characterization and treatment of Nelco's obligation for deferred taxes. The trustee contends that because the deferred taxes will never be paid to federal or state tax authorities, any liabilities for deferred taxes have been eliminated; thus the remaining balance due from Un–Ltd. to the estate is $6,087,289.22. (This claim is

based upon $5,808,547.22 in loans advanced by Nelco to Un–Ltd. and the affiliates plus interest of $278,742.00 which Un–Ltd. charged Nelco on deferred taxes payable.)[10] In contrast, the defendants characterize the deferred tax liabilities as an LOC indebtedness with a net amount of $551,993.17 due to Un–Ltd., representing the excess balance Nelco owes for deferred taxes previously accrued. (This was the amount of Un–Ltd.'s initial proof of claim.)[11]

As stated above, Nelco's sale of all its assets in 1996 eliminated the deferred taxes it would have owed on those assets. The sole question is whether the deferred tax liabilities that were entered in Nelco's books were an unconditional debt that Un–Ltd. may assert against Nelco's trustee in bankruptcy.

Strong support for the trustee's position is found in the tax allocation agreement (TAA) among Un–Ltd., Nelco and NL Investments. Paragraph 2 of the TAA states that "[e]stimated tax payments will be made [to the federal and state tax authorities] by the Parent [Un–Ltd.] through loans from Subsidiary1 [Nelco]. These loans will be recorded in the records of the Parent and Subsidiary1 through the use of the 'Due (To)/From' account." (TAA ¶ 2.) Thus, the TAA plainly provides that Nelco was to *loan* funds to Un–Ltd. for tax payments.[12] The TAA makes

no provision for Nelco to remit funds to Un–Ltd. for deferred taxes.

It follows that under the TAA, deferred tax payments are not an absolute liability of Nelco. However, the defendants argue that paragraph 2 of the TAA was effectively modified by the parties' LOC. The court must therefore consider whether (1) the TAA is ambiguous with respect to the treatment of deferred tax payments, or (2) whether the LOC adopted by Nelco and Un–Ltd. made deferred tax payments an irreversible obligation of Nelco either by modification of the TAA or otherwise.

1. **Whether TAA terms are ambiguous so that the court may use parole evidence to interpret the agreement.**

■■■■ Under Virginia law a court may not alter the express terms of a contract, whether or not those terms are fair and equitable. *See* 4B Michie's Jurisprudence, Contracts § 40 (Michie 1986 Replacement). Parol evidence may not be used to contradict the express terms of a contract or written agreement. *See Swengler v. ITT Corp. Electro–Optical Prod. Div.*, 993 F.2d 1063, 1069 (4th Cir.1993); *Anden Group v. Leesburg Joint Venture*, 237 Va. 453, 377 S.E.2d 452, 455 (1989) (citations omitted). Only where a contract is ambiguous may a court resort to parol evidence to ascertain the true intention of the parties in entering the contract. *See Aetna Cas. & Sur. Co. v.*

---

**10.** The trustee increased the due from Un–Ltd. account by this sum to eliminate interest erroneously charged by Un–Ltd. The interest charges were reversed because eliminating Nelco's deferred tax liabilities eliminates all liabilities from the LOC calculation. This results from the shifting of the LOC calculation from a payable to a receivable (from Nelco's point of view). Following Nelco's prior course of dealings, not only should the interest expense be eliminated, but interest income should have been accrued in favor of Nelco. This the trustee did not do. The interest

expense elimination increased the receivables balance by 5%. (Tr. 159–60.)

**11.** In May 1997, Un–Ltd. filed an amended proof of claim for $1,121,993.00 which will be addressed in full *infra.*

**12.** There is no evidence in the record, nor did either party ever contend, that any portion of the liability from Nelco to Un–Ltd. was a result of anything other than tax payments.

*Fireguard Corp.*, 249 Va. 209, 455 S.E.2d 229, 232 (1995); *Anden Group*, 377 S.E.2d at 455; *see also Swengler*, 993 F.2d at 1069. In this case the TAA's use of the word "loans" in paragraph 2 appears to be unambiguous. Even so, the overall structure and intent of the TAA is ambiguous and at times contradictory. *Compare, e.g.*, TAA ¶ 1.03 ("Taxes due may not be less than zero"), *with* TAA ¶ 4 (Examples A and B show negative taxes due of (25) and (20), respectively). Furthermore, the TAA at no point directly addresses the payment of deferred taxes nor allocation of tax benefit from a net operating loss generated by every member of the affiliated group. Accordingly, the court concludes the TAA is sufficiently ambiguous as a whole to permit a further inquiry into the intent of the parties.

■ The court must interpret the contract to determine the intent of the parties at the time of contract. In doing so, the court should consider the situation of the parties at the time of contract, the subject matter, the purpose and the intention of the parties in making the contract. There is nothing in the present record to suggest that when the parties entered the TAA, they anticipated there would come a time when Nelco's deferred tax liabilities would be reduced to zero because the company would no longer have future taxable income. Accordingly, the court must consider what the parties would have agreed to had they contemplated the current situation.

■ When a business contract is ambiguous, it is to be interpreted in accordance with sound business practice. A contract will not be interpreted to inflict unreasonable hardship unless its terms clearly impose the hardship. *See* 4B Michie's Jurisprudence, Contracts § 43. An intent by the parties for Nelco to remain liable for the payment of deferred taxes in the event that it ceased to incur tax liability would not have been in keeping with sound business practice and further would have imposed an unreasonable hardship on Nelco. Under the defendants' interpretation, Nelco would have intended to give to Un–Ltd. $6,087,289.22 for zero consideration.[13] Accordingly, the court concludes that at the time the TAA was entered, the parties did not intend the deferred tax payments to be an irrevocable transfer should Nelco ever be absolved of all future tax liability.[14]

**13.** Defendants claim Nelco's consideration for the deferred tax payments is Un–Ltd.'s assumption of all future tax liability. The court, however, finds this argument without merit. The TAA does not propose to shift liability for tax payments to Un–Ltd. Furthermore, under Treas. Reg. § 1.1502–6(a) ¶ 34,250, companies filing a consolidated return have joint and several liability for the consolidated group's tax liability. No authority exists to relieve Nelco of its continuing liability for its own and the consolidated group's tax payments.

And there is evidence of Nelco's accountant's concern that because Un–Ltd. did not generate cash, Nelco might have to pay its taxes twice. *See* letter of KPMG to Nelco dated April 1, 1994. Nelco's response to KPMG's letter was that this would not be a problem because Nelco's cash projections illustrated "the ability of [Un–Ltd.] to pay its tax liabilities as they come due in the future." (Plaintiff's Ex. 31.) This is a rather clear statement that KPMG's concerns were valid.

**14.** The court notes that under the defendants' construction of the transactions the court could find a breach of fiduciary duty by Nelco's president Mr. Nelson, if the trustee had brought such a complaint. The result of the defendants' position is nothing short of pillaging debtor Nelco for the benefit of Un–Ltd. and its other affiliates without any benefit to Nelco. Additionally, pursuant to the TAA, Nelco would always be responsible for its current taxes; there would never be a point in time when Un–Ltd. would pay the current taxes with funds collected as deferred taxes from Nelco. This purported operation of the

## 2. Whether the LOC made deferred taxes an irreversible obligation of Nelco either by modification of the TAA or otherwise.

■ The defendants argue that in at least one crucial respect the TAA was modified by the LOC and the parties' subsequent course of conduct. According to the defendants, paragraph 2 of the TAA was modified to eliminate the requirement that Nelco loan Un–Ltd. all tax payments. Instead, under the LOC Nelco had an absolute obligation to pay all deferred taxes to Un–Ltd. These payments were then re-loaned to Nelco, initiating a debt owed by Nelco to Un–Ltd. In return for Nelco's payment of deferred taxes, defendants claim Un–Ltd. assumed all future tax liability of Nelco.

A major problem for the defendants is the absence of a provision in the line of credit agreement supporting their position. The LOC balance is a summary of 40 general ledger accounts which were tracked in a spreadsheet maintained by a Nelco accountant. In substance, defendants contend that the accounting entries in themselves, along with the annual audited financial statements, establish the LOC that they urge the court to accept.[15]

The initial TAA agreement was entered by the parties in 1991, *nunc pro tunc* to January 1, 1989. This document was subsequently lost, and the current TAA was executed on November 30, 1993, *nunc pro tunc* to January 1, 1989. The defendants claim the LOC actually began on January 1, 1993, at which time the accounts between Nelco and Un–Ltd. were "zeroed out," making Nelco's current and deferred taxes for the period due to Un–Ltd. This is said to have initiated the payment/loan cycle which characterized the LOC. Of course, if the LOC were established on January 1, 1993, this would have been almost a year before the TAA was re-executed. The record offers no explanation of why the TAA was re-executed if some of its provisions had been modified by the LOC.

Undoubtedly, Nelco and Un–Ltd. made the LOC accounting entries described in this opinion to record Nelco's providing of funds to the consolidated group and payment of its taxes. From Nelco's records defendants assert that beginning in 1992, Nelco's funding of its tax payments were not treated as loans to Un–Ltd. as provided by paragraph 2 of the TAA but rather as a debt to Un–Ltd. This is the essential evidence of the LOC upon which the defendants rely. Nowhere is there a specific indication that Nelco was to remain liable on estimated future taxes entered in its books that might never become due.

■ The TAA provides that it cannot be amended except by written agreement. No such amendment was executed. The parties to the TAA are presumed to have meant what their written agreement clearly states. *See* 4B Michie's Jurisprudence, Contracts § 45. Where parties have elected to put an agreement in writing, the words of the agreement control, and their actual intent is ineffective. *See Lynnhaven Beach & Park Co. v. Moore,*

---

TAA creates nothing but a siphoning of money from Nelco. Such a transaction would create a clear violation of Nelson's fiduciary duty of loyalty to Nelco and could potentially create personal liability for the full $6,087,289.22 against Nelson. Because the court does not believe that Nelson's management of Nelco should be so interpreted, the court finds the trustee's construction of events to be in keeping with non-reckless business management and behavior.

15. Typically, Nelco's annual audited balance sheet reflected a single intercompany asset or liability amount that represented a summary of the LOC accounts.

156 Va. 683, 158 S.E. 896, 900 (1931). The intention of the parties is determined on the date of execution of a contract. *See* 4B Michie's Jurisprudence, Contracts § 53. Because intention is determined at execution, the parties to the TAA must have intended to enter the agreement according to its terms on the date of execution, November 30, 1993. The fact that the contract was executed nunc pro tunc does not obviate their intention on the date of execution. If in fact the LOC was entered in January 1993, it would have been in existence at the time of re-execution and should have been reflected in the TAA, if that was the parties' intent.

 The burden of proof for modification of a written contract is on the party seeking to establish a subsequent modification. *See Cardinal Dev. Co. v. Stanley Constr., Inc.,* 255 Va. 300, 497 S.E.2d 847, 851 (1998); *Stanley's Cafeteria, Inc. v. Abramson,* 226 Va. 68, 306 S.E.2d 870, 873 (1983); *Combs v. McLynn,* 187 W.Va. 490, 419 S.E.2d 903, 907 (1992). Even if the parties could have modified their written contract through subsequent action, the terms of the modification must be specific and direct, leaving no doubt about their intention to change the written contract, and the modification must be supported by consideration. *See id.*

Not only did the parties fail to amend the TAA or execute an LOC agreement that supports the defendants' position, there is no evidence of consideration to support a modification of the TAA. The defendants contend Nelco's consideration was Un–Ltd.'s assumption of all future tax

liability. This argument is without merit because Un–Ltd. never formally assumed Nelco's tax liability. Moreover, there was a real possibility, which was of concern to Nelco's auditors, that Nelco might have to pay its taxes twice. Finally, as a matter of law, Nelco could not have absolved itself from future tax liability. *See* Treas. Reg. § 1.1502–77(a) (imposing joint and several liability on consolidated group filings).

From these circumstances, the court concludes that the claimed creation of an LOC on January 1, 1993, did not modify paragraph 2 of the TAA. Once Nelco filed bankruptcy and became a fiduciary for its creditors, it could have and should have insisted that paragraph 2 meant what it said. Ultimately, however, as the preceding discussion illustrates, the modification question becomes a minor issue because neither the LOC nor the TAA, even if modified, support defendants' extraordinary position that Nelco has permanent liability for estimated future taxes. Moreover, even aside from their failure to modify the TAA, there is nothing in the parties' course of dealing that treated Nelco's payments to affiliates as nonrefundable deferred taxes.[16]

The court has previously noted that the LOC was not a typical line of credit. Viewed in light of Nelco's bankruptcy, the LOC may be regarded as an artifice employed by Un–Ltd. to gain ready access to Nelco's cash without violating Signet Bank's loan covenants.[17] It should not convert nonexistent liability into actual liability.

---

**16.** Actually, the court decided this issue by the following findings of fact on page 8:

At no time did Nelco agree, either under the LOC or otherwise, to pay Un–Ltd. for deferred taxes that are not in fact payable to taxing authorities. Therefore, with the elimination of Nelco's liability to pay deferred taxes following the liquidation of its assets, Nelco

has no obligation to pay Un–Ltd. any sum in the deferred taxes accounts that remain on the books.

**17.** The LOC was not disclosed in Nelco's bankruptcy schedules, monthly operating reports or disclosure statement.

Because it seems clear from the record that before discovery of the stealth fraud the defendants had never seriously considered the possibility that at some point Nelco's future tax liability would be reduced to zero, the LOC had never been required to deal with the situation presented to the court. And Nelco's bankruptcy filing severely restricted its ability to assume liability for a highly questionable debt to an affiliated company without notice to creditors and court approval.

At trial, the trustee's expert forensic accounting witness, who conducted an exhaustive examination of Nelco's books, pointed out that the defendants' present position on the LOC is inconsistent with Nelco's prior treatment of deferred taxes. There are a number of instances in the record where deferred taxes were reduced when the prior estimates proved excessive. *See, e.g.,* Plaintiff's Proposed Post-Trial Findings of Fact and Conclusions of Law, 30–31. Thus, the course of dealing between Nelco and Un–Ltd. actually illustrates that Nelco's liability for deferred taxes was not irreversible. The trustee's position is also supported by Nelco's monthly operating statements prepared by defendants and filed in the chapter 11 case and by defendants' calculation of the LOC in November 1996. In fact, it was not until December 1996 that defendants adopted the LOC position they claim in this proceeding. Their position appears to have been derived in hindsight, perhaps as the appointment of a bankruptcy trustee for Nelco loomed on the horizon.

Finally, even if the defendants have established their asserted LOC for intercompany transaction purposes, the terminology applied does not alter the ultimate analysis and outcome. The intercompany accounts which comprise the defendants' LOC are the same as those which comprise the payment of deferred taxes under the trustee's analysis. Although the terminology employed may be different, the result is the same: there cannot be continuing liability for Nelco to pay deferred taxes to Un–Ltd. which will never become due. No persuasive evidence was presented at trial demonstrating that Un–Ltd. provided consideration for the deferred tax payments at any time after the parties entered into the TAA agreement.

Accordingly, the court finds that Nelco has no liability to Un–Ltd. for deferred tax payments under the LOC or otherwise.

### Un–Ltd. Proof of Claim.

Un–Ltd. has filed a proof of claim for $1,121,993.00. Of this sum, $551,993.17 represents the net total deferred tax liability due on the LOC and reduced by Nelco's loans for the affiliates' benefit. As stated previously, this was the amount of Un–Ltd.'s initial proof of claim. The current proof of claim includes an additional $570,000.00, which Un–Ltd. claims is its share of the 1996 tax refund.

Because the court has found that Nelco is not liable to Un–Ltd. for deferred tax payments that will never become due, Un–Ltd.'s proof of claim for that portion which relates to the excess LOC amount due must also be denied. Accordingly, the $551,993.17 portion of the claim will be disallowed. The remainder of the Un–Ltd.'s proof of claim will be addressed with the tax refund issues in Counts II and III below.

### Conclusion—Counts IX and XI.

According to the court's analysis, payments of cash by Nelco to Un–Ltd. or its affiliates were recorded as loans. As such, they are a pre-petition receivable of Nelco under the due from Un–Ltd. account. Because the court has ruled against defendants' defenses regarding payment of these loans, the statute of limitations and the LOC deferred tax provision, the loan

amounts extended by Nelco to Un–Ltd. (and the affiliates) are due and payable to the bankruptcy estate. In addition, Un–Ltd. improperly charged Nelco interest on the deferred tax account in the amount of $278,742.00, which sum should be restored to the receivable account. Accordingly, the trustee is entitled to judgment under Count IX of the amended complaint in the amount of $6,087,289.22. With respect to the trustee's objection to Un–Ltd.'s proof of claim, Count XI, that portion of the claim based upon Nelco's deferred taxes of $551,993.17 will be disallowed.

## COUNTS II and III—TAX REFUND ISSUES.

The court's memorandum opinion entered February 16, 1999, held that the TAA agreement between Nelco, Un–Ltd. and NL Investments does not address the allocation of tax refunds among the consolidated group. Accordingly, the court now must determine the allocation of the 1995 refund of $477,347.17 and defendants' claim to $570,000.00 of the 1996 refund.[18]

■ The general rule for allocation of tax refunds, absent a clear and explicit agreement, is that a member of an affiliated group is entitled to that portion of the refund generated by the member's losses and offset against those taxes previously paid by the member. *See Capital Bancshares, Inc. v. FDIC*, 957 F.2d 203, 207–08 (5th Cir.1992); *Western Dealer Management, Inc. v. England (In re Bob Richards Chrysler-Plymouth)*, 473 F.2d 262, 264–65

(9th Cir.1973); *Jump v. Manchester Life & Cas. Management Corp.*, 438 F.Supp. 185, 188–89 (E.D.Mo.1977), *aff'd*, 579 F.2d 449 (8th Cir.1978).

■ Under the general rule, a member of an affiliated group is entitled to that portion of the refund generated by the member's losses but *only* to the extent of the taxes previously paid by the member.[19] *See United States v. Revco (In re Revco)*, 111 B.R. 631, 638 (Bankr.N.D.Ohio 1990) (emphasis added). As noted most recently in *Nisselson v. Drew Indus., Inc. (In re White Metal Rolling and Stamping Corp.)*, 222 B.R. 417, 425 (Bankr.S.D.N.Y. 1998), "[t]he right to the refund is limited, however, to the amount of tax that the loss corporation paid during the carryback year. The loss corporation has no right to the excess, and has no rights against the other affiliated group members who benefit from the carryback." 222 B.R. at 425.

During the years in issue, all tax payments of the consolidated group were funded by Nelco. At no time did any other affiliate or Un–Ltd. contribute to the tax payments. Un–Ltd. argues it is entitled to all refunds because Nelco had an unconditional duty to pay both current and deferred taxes to Un–Ltd. pursuant to the modification of the TAA by the LOC. Thus, Un–Ltd. contends that any tax payments refunded by the IRS belong to Un–Ltd. (1) to offset the outstanding debt due on the LOC from Nelco to Un–Ltd., or (2)

---

**18.** Count I alleges Un–Ltd. violated the automatic stay by retaining the 1995 refund which is property of the estate. The trustee seeks turnover, attorney's fees and costs pursuant to 11 U.S.C. § 362(h). Count III seeks turnover of the 1995 refund as property of the estate. Count II seeks turnover of the disputed portion of the 1996 refund.

**19.** A member of an affiliated group may, however, participate in group consolidated federal

income tax refunds generated largely by the member's losses in an amount *larger* than the member's own tax payments in only two circumstances: (1) to offset future tax liability of the member, or (2) to the extent the losses can be used to bargain with affiliates for the use of the loss. *See Jump*, 579 F.2d at 453. The court previously has ruled that neither exception is applicable to Un–Ltd. *See* Memo. Op. entered Feb. 16, 1999.

because Un–Ltd. actually issued the check to IRS.

However, the court has previously concluded that the amount due to Un–Ltd. for deferred taxes under the LOC has been reduced to zero as a matter of law because deferred taxes will never become due. Accordingly, Un–Ltd. cannot recover any portion of the tax refunds under this theory.

Secondly, the court concludes that the fact that Un–Ltd. actually paid the IRS is immaterial for calculating a member's participation in a tax refund. The case law is clear that a member of a consolidated group can participate in a tax refund only to the extent of tax payments made by that member. *See Capital Bancshares,* 957 F.2d at 207–08; *In re Bob Richards Chrysler-Plymouth,* 473 F.2d at 264–65; *Jump,* 438 F.Supp. at 188–89. The most recent case to address this issue succinctly stated the rule as follows:

> In the absence of a tax allocation agreement, principles of unjust enrichment dictate that a loss corporation is entitled to receive the refund generated by the application of its NOL [net operating loss] carryback to reduce the amount of income tax *that it paid* during the carryback year.

*In re White Metal Rolling and Stamping Corp.,* 222 B.R. at 424 (emphasis added).

Accordingly, because neither Un–Ltd. nor NL Investments and its subsidiaries ever contributed to the tax payments of the consolidated group they may not participate in any tax refunds generated by their own or Nelco's losses. To allow a member of a consolidated group to receive a tax refund when the member did not contribute to the tax payment would result in the unjust enrichment of that member. *See id.* at 425. When a member's losses no longer have value, either because they cannot be used to bargain for a better position or because the company no longer exists, the fact that the refund is provided to other members of the consolidated group "simply ha[s] the fortuitous effect of permitting the profitable members to recover the taxes that they had paid." *Id.*

### Conclusion—Counts II and III.

■ Because Nelco was at all times the sole source of funding for all tax payments, to allow Un–Ltd., NL Investments and its subsidiaries to participate in any tax refund generated by the consolidated group would unjustly enrich those entities. Accordingly, the court concludes that under Counts II and III, the trustee is entitled to the 1995 refund in the full amount of $477,347.17 and the disputed portion of the 1996 refund in the amount of $570,000.00.

### COUNT I—VIOLATION OF THE AUTOMATIC STAY.

■ Bankruptcy Code § 362 imposes an automatic stay on actions of creditors to satisfy their claims against debtors and prohibits the "exercise [of] control over property of the estate." 11 U.S.C. § 362(a)(3). As the court has concluded above, the 1995 refund is property of the bankruptcy estate; thus Un–Ltd.'s retention and subsequent expenditure of the money constitutes a violation of the automatic stay.[20]

---

**20.** Defendants argue that a violation does not exist because (1) according to the advice received by defendants' professionals at the time the 1995 refund was received, they believed at least a portion of the 1995 refund belonged to Un–Ltd., and (2) because Nelson in good faith believed that Un–Ltd. was entitled to the entire amount of the 1995 refund.

The court finds defendants' first contention to be without merit. Un–Ltd. retained the entire 1995 refund even though it was clear from Un–Ltd.'s professionals that at least

■ Count I of the trustee's amended complaint alleges that the defendant Un–Ltd.'s retention and subsequent spending of the 1995 refund constituted a violation of the automatic stay. Consequently, the trustee seeks an award of attorney's fees pursuant to § 362(h), which permits a court to impose attorney's fees, costs and punitive damages for a willful violation of the automatic stay.

■■■ A willful violation of the automatic stay occurs when the creditor is aware of the automatic stay and acts intentionally. *See Citizens Bank of Md. v. Strumpf (In re Strumpf)*, 37 F.3d 155, 159 (4th Cir.1994), *rev'd other grounds*, 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995); *Budget Serv. Co. v. Better Homes of Va.*, 804 F.2d 289, 292–93 (4th Cir.1986); *In re Manuel*, 212 B.R. 517, 519 (Bankr. E.D.Va.1997). A creditor's actions against property of the estate may be construed as willful even if the creditor believes itself to be justified in its actions. *See In re Sharon*, 200 B.R. 181, 200 (Bankr.S.D.Ohio 1996); *In re Gray*, 97 B.R. at 936.

The court concludes that the retention of the 1995 refund by Un–Ltd. constituted a willful violation of the automatic stay. Nelson and Un–Ltd. were aware of debtor's bankruptcy and that the automatic stay prevented acts against the property of the estate. Although Nelson in his capacity as President of Un–Ltd. may have believed the entire 1995 refund belonged to Un–Ltd., his belief was not supported by the advice of the defendants' professionals or papers filed with this court.[21] Accordingly, the court concludes that the defendant Un–Ltd.'s acts constituted a willful violation of the automatic stay entitling the plaintiff to recover a portion of the costs and expenses incurred in this adversary proceeding as related to the 1995 refund.

## COUNTS V AND VI—BREACH OF FIDUCIARY DUTIES.

Counts V and VI of the trustee's complaint allege breach of fiduciary duties with respect to the 1995 return by Nelson and Un–Ltd., respectively.

### Nelson.

■ When a corporation becomes insolvent and files bankruptcy, the duty of the officers and directors shifts from the shareholders to creditors. *See FDIC v. Sea Pines Co.*, 692 F.2d 973, 976–77 (4th Cir.1982). The directors and officers of the debtor in possession are under a fiduciary duty to act for the benefit of the estate. *See* 11 U.S.C. § 1107. The debtor in possession is afforded the duties and responsibilities of a trustee. *See id.* The director or officer becomes a trustee of the estate for the benefit of creditors.

■ A trustee, and therefore the debtor in possession, may not take a position adverse to the estate. *See Commodity Futures Trading Comm. v. Weintraub*,

---

some portion of the money ultimately belonged to Nelco. Thus, Un–Ltd.'s exercise of control over that portion which belonged to Nelco and should have been returned to the estate was a violation of the automatic stay.

Secondly, a good faith belief does not constitute a defense for a violation of the automatic stay. The automatic stay is the most fundamental protection afforded a debtor in bankruptcy. Where there is uncertainty as to whether the creditor's actions will violate the automatic stay, the creditor should seek court permission and relief from stay. *See In re Gray*, 97 B.R. 930, 936 (Bankr.N.D.Ill.1989).

The creditor undertakes the risk of sanctions pursuant to § 362(h) when it attempts to interpret the application of the automatic stay and the scope of property to which it applies. *See id.*

21. Two days after Un–Ltd. received the 1995 refund, KPMG advised Nelson that at least $260,000.00 of the refund belonged to Nelco. Furthermore, the disclosure statement filed by Nelco and signed by Mr. Nelson estimated that Nelco was due at least $250,000.00 of the 1995 refund.

471 U.S. 343, 355, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985); *Mosser v. Darrow,* 341 U.S. 267, 271, 71 S.Ct. 680, 95 L.Ed. 927 (1951); *see also Mardel Sec., Inc. v. Alexandria Gazette Corp.,* 183 F.Supp. 7, 14–15 (E.D.Va.1960). An officer or director of the debtor in possession may be held personally, liable for the losses suffered by the debtor when the officer acts willfully and deliberately, disregarding the estate's best interest. *See United States ex. rel. Willoughby v. Howard,* 302 U.S. 445, 450, 58 S.Ct. 309, 82 L.Ed. 352 (1938); *In re San Juan Hotel Corp.,* 71 B.R. 413, 426 (D.P.R.1987); *see also Mardel Sec., Inc.,* 183 F.Supp. at 14–15. Furthermore, officers of the debtor are officers of the court due to their duty to act in the best interest of the estate and their assumption of fiduciary duties on behalf of the estate. *See Gumport v. China Int'l. Trust and Inv. Corp. (In re Intermagnetics Am., Inc.),* 926 F.2d 912, 917 (9th Cir.1991). Similarly, a corporate officer with fiduciary duties "is often denominated a trustee under theories of implied or constructive trust." *Adams Lab., Inc. v. Garrett (In re Adams),* 3 B.R. 495, 497–98 (Bankr. E.D.Va.1980).

■ Nelson was the president and CEO of the debtor Nelco. At the time the 1995 refund was received by Nelson and Un–Ltd., Nelco was still a debtor in possession, and Nelson had a fiduciary duty to the creditors of Nelco to disclose the receipt of the refund. By not disclosing its receipt, he failed to act in the best interest of the estate. Rather, he took a position adverse to the estate by asserting that the money belonged to Un–Ltd. and could be used at Nelson's own discretion. To the contrary, the Nelco estate's best position was that the refund was an estate asset, as the court has now held.

As a result of Nelson's failure to disclose the receipt of the 1995 refund, the estate and its creditors did not become aware of the 1995 refund until it had been spent by Un–Ltd. Nelson's breach, therefore, directly caused or contributed to the estate's loss of an asset of $477,347.17. Because the court must find under these circumstances that Nelson acted with willful disregard of the estate's best interest, Nelson will be held personally liable to the estate for the full 1995 refund under Count VI.

*Un–Ltd.*

■ Un–Ltd., as the debtor's parent company, received the 1995 refund due to Nelco and held the money as a fiduciary. *See Capital Bancshares,* 957 F.2d at 207 (citing *In re Bob Richards,* 473 F.2d at 265 (holding that the parent held the IRS refund as trustee of a specific trust)). Thus, Un–Ltd.'s intentional expenditure of the refund constituted a violation of the fiduciary duty owed to its subsidiary Nelco. As a result Un–Ltd. will be also held liable to the Nelco estate for the full 1995 refund under Count V.

Nelson and Un–Ltd. rely on Virginia Code § 13.1–690, which allows a director or officer to avoid personal liability for business decisions if the advice of professionals is utilized.[22] Yet, Nelson has not demonstrated that he relied upon the advice of professionals. The evidence actually shows that he disregarded the advice he

---

**22.** Section 13.1–690 states:

A. A director shall discharge his duties as a director, including his duties as a member of a committee, in accordance with his good faith business judgment of the best interests of the corporation.

B. Unless he has knowledge or information concerning the matter in question that makes reliance unwarranted, a director is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by:

%...

2. Legal counsel, public accountants, or other persons as to matters the director

sought from KPMG, which informed Nelson on November 5, 1996, that $260,000.00 of the refund belonged to the Nelco estate. Nelco's bankruptcy counsel also apparently relied upon this advice in preparing Nelco's disclosure statement. Finally, there is no evidence that any of Nelson's professionals ever advised him that the full 1995 refund belonged to Un–Ltd.

At no time did Un–Ltd.'s officers or directors, other than Nelson, seek advice on the allocation of the 1995 refund. Accordingly, the safe harbor provisions of Virginia Code § 13.1–690 are not available to Nelson or Un–Ltd.

## COUNT XI—UN–LTD.'S PROOF OF CLAIM.

The court previously discussed and disallowed that portion of Un–Ltd.'s proof of claim which was derived from the alleged balance due to Un–Ltd. under the LOC. The $570,000.00 remainder of Un–Ltd.'s proof of claim is based on its assertion that Un–Ltd. had incorrectly given Nelco an LOC credit for $570,000.00 of the 1996 tax refund. Thus, Un–Ltd. reduced the amount due from Nelco on the LOC by $570,000.00 because Un–Ltd. had intended to retain this portion of the refund. The proof of claim was amended when it became clear to all parties that the trustee disputed Un–Ltd.'s entitlement to any portion of the 1996 refund. Because the court has concluded that Un–Ltd. is not entitled to any of the 1996 refund, this portion of Un–Ltd.'s proof of claim will also be disallowed. Consequently, the court will sustain the trustee's objection to the full amount of Un–Ltd.'s proof of claim.

## COUNT VIII—NELSON'S $800,000.00 BONUS.

■ Pursuant to 11 U.S.C. § 548(a)(1)(B) the trustee seeks to recover an $800,000.00 bonus payment made to Nelson in December 1995. The trustee may recover under § 548(a)(1)(B) if the debtor received less than reasonably equivalent value for the services rendered by Nelson, and Nelco was insolvent or became insolvent as a result of the transfer. *See* 11 U.S.C. § 548(a)(1)(B). The burden of proof for both elements is with the trustee. *See Cooper v. Ashley Communications, Inc. (In re Morris Communications NC, Inc.)*, 914 F.2d 458, 466 (4th Cir.1990).

■ Whether reasonably equivalent value was received by the debtor on the date of transfer is a two step analysis: (1) did the debtor receive value, and (2) was the payment reasonably equivalent to the value extended? *See Mellon Bank v. Official Comm. Of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 149 (3d Cir.1996).

■ The court finds that the debtor received value from the services of Nelson. He operated the business of Nelco, and when the bonus was paid management believed that Nelco had generated substantial profits for the company during 1995. Nelson was essential to Nelco's business operations: he was the founder of the company, and it was through his efforts that Nelco operated as a successful computer leasing company until the discovery of the stealth fraud. In exchange for the bonus payment, Nelco received the continuing goodwill and loyalty of Nelson in his capacity as president of the debtor.

■ The court also finds that the payment was reasonably equivalent to the value extended. Reasonably equivalent value is determined from the totality of the circumstances surrounding the transaction. *See In re Morris Communications*, 914

believes, in good faith, are within the person's professional or expert competence . . . .

tence . . . .

F.2d at 466–67. Among the factors to be considered by a court are: (1) the good faith of the transferee; (2) the amount of discrepancy between the amount paid and fair market value; (3) the ratio or percentage of the amount paid to fair market value; and (4) whether there was an arms length transaction between willing parties. *See id.* at 467. Here the court finds that parties acted in good faith. They acted without knowledge of Nelco's insolvency and in accordance with the parties prior practice. Nelson's bonus payment in 1995 was not substantially higher than in previous years. Furthermore, the court is not persuaded by the trustee's evidence that the bonus payments made to Nelson were substantially above the fair market value for CEO's in the computer leasing business. In fact, there is evidence to support Nelson's argument that his total 1995 compensation was reasonable.

Because Nelco received reasonably equivalent value for Nelson's $800,000.00 bonus payment, the question of Nelco's insolvency need not be addressed.[23] Accordingly, the court finds that the trustee has not sustained his burden of proof on

this issue and will dismiss Count VIII of the trustee's complaint.

An order consistent with this memorandum opinion will be entered.

---

**23.** The court has found as a fact that the retroactive removal from Nelco's 1995 earnings of the stealth fraud losses would have rendered Nelco insolvent in December 1995 when the bonus was paid.

In general, the cases support the view that insolvency at a particular point in time is determined without regard to subsequent events. *See Travellers Int'l. AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.),* 134 F.3d 188, 197–98 (3d Cir.1998) ("There is overwhelming authority to the effect that ... subsequent dismemberment [of the debtor] ... should not enter into the picture.") (quoting Lawrence P. King, 2 *Collier On Bankruptcy* ¶ 101.32[4], p. ·101–16 (15th ed.1997)); *Coated Sales, Inc. v. First E. Bank N.A. (In re Coated Sales, Inc.),* 144 B.R. 663, 668 (Bankr. S.D.N.Y.1992) ("[A] company's assets must be valued at the time of the alleged transfer and not at what they turned out to be worth at some time after the bankruptcy intervened.").

*In re Coated Sales,* 144 B.R. 663, a ruling on a preference action under § 547(b)(3), involved the retroactive effect of a discovery of fraud. Following the alleged preferential transfer, it was discovered that three of the debtor's officers had defrauded the company; this discovery along with other cash flow problems drove the debtor into bankruptcy. In the preference action, the bankruptcy court considered the officers' fraud because it "shed light on a fair and accurate assessment of the asset or liability" on the transfer date and was not a use of impermissible hindsight. 144 B.R. at 668. *In re Coated Sales* is distinguishable from the present case because Nelco's officers were not involved in the stealth fraud. Yet, the holding is support for the trustee's argument here that the court should take the stealth leases into account on the issue of Nelco's insolvency in December 1995.